**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **WILFREDO and ODALID BOSQUE and GERMANO DEPINA, on behalf of themselves and all others similarly situated,**<br><br>   **Plaintiffs,**<br>**vs.**<br><br>**WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY,**<br><br><br>   **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO. 10-10311**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Wilfredo and Odalid Bosque and Germano DePina bring this suit on behalf of themselves and a class of similarly situated Massachusetts residents ("Plaintiffs") to challenge the failure of Defendant Wells Fargo Bank, N.A. d/b/a Wells Fargo Home Mortgage d/b/a America's Servicing Company ("Defendant" or "ASC") to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.     Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that

promise to be kept.  This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure.

3.       In October 2008, Wells Fargo Bank, N.A. accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  Six months later Wells Fargo Home Mortgage signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which ASC received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

4.       As a participating servicer in HAMP, ASC has, in turn, entered into written agreements with Plaintiffs for temporary trial modifications.  Plaintiffs, for their part, have complied with these agreements by submitting the required documentation and making payments.  Despite Plaintiffs' efforts, Defendant ASC has ignored its contractual obligation to modify their loans permanently.

5.       As a result, hundreds, if not thousands, of Massachusetts homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  Defendant's actions thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

6.       Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because the action is between parties that are citizens of different states and the amount in controversy is greater than $75,000.  For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate.  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).  ASC is, on information and belief, a citizen of California.  Plaintiffs are citizens of Massachusetts.

7.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that it is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

8.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiffs reside in this District.

## PARTIES

9.     Odalid and Wilfredo Bosque are a married couple residing at 3 Elizabeth Circle, Leominster, MA 01453.

10.     Germano DePina is an individual residing at 5 Tupelo Street, Roxbury, MA 02119.

11.     Wells Fargo Bank, N.A. is a mortgage lender with a principal place of 5 business at 420 Montgomery Street, San Francisco, CA 94104.

12.     America's Servicing Company is an operating unit of Wells Fargo Bank, NA located in Fort Mill, South Carolina.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

13.     Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[1]

14.     The number of Massachusetts properties with foreclosure filings in 2008 was 150% higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two years.[2]

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

15.     According to 2009 data, the numbers continue to rise; in the third quarter of 2009, foreclosures were filed on 12,667 Massachusetts properties, a 35% increase over the same period of 2008.[3]  Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure filings against them which, while slightly less than 2008, still represents an increase of over 100% from 2007 levels and an increase of more than 400% over 2004.[4]

16.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

17.     State legislative efforts were able to temporarily slow the pace of completed foreclosures in 2009, but toward the end of the year, the number of new filings once again rose, demonstrating that foreclosures were merely delayed, not prevented.[5]

18.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

---

[2] RealtyTrac Staff. Foreclosure Activity Increases 81 Percent in 2008. Jan. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681.
[3] RealtyTrac Staff. U.S. Foreclosure Activity Increases 5 Percent in Q3. Oct. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=7706.
[4] RealtyRrac Staff.  RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings in 2009.  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333
[5] For 2007 comparison, see Gavin, Robert. Fewer Lose Their Homes in August. Boston Globe. Sept. 23, 2009. Available at http://www.boston.com/realestate/news/articles/2009/09/23/foreclosures_in_mass_drop_but_petitions_soar/.

### *Creation of the Home Affordable Modification Program*

19.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A. §5201 *et. seq.* (2009).

20.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

21.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

22.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

23.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

24.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C.A. §5219.

25.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

26.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

27.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

28.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

29.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

30.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

31.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.   Servicers receive $1000.00 for each HAMP modification.

### Broken Promises Under HAMP

32.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans.  America's Servicing Company is a servicer operated by Wells Fargo Bank, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

33.     Should a servicer elect to participate in HAMP,[6] they execute a Servicer Participation Agreement ("SPA") with the federal government.

34.     On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an SPA, thereby making ASC a participating servicer in HAMP.  A copy of this SPA is attached hereto as Exhibit 1.

35.     The SPA executed by Mr. Heid incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA 1.B.), and are incorporated by reference herein.

36.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  (SPA 1.A., 2.A.)[7]

37.     The Program Documentation requires Participating Servicers to evaluate *all loans*, which are 60 or more days delinquent for HAMP modifications.  (SD 09-01 p. 4.)  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

---

[6] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program, are subject to mandatory inclusion in HAMP.  Otherwise, participation by servicers in the HAMP program is voluntary.

[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.

38.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[8]  The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

39.     ASC offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

40.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

41.     ASC has routinely failed to live up to their end of the TPP Agreement and offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that ASC's parent company had 350,169 HAMP-eligible loans in its portfolio.  Of these loans, just 8,424 resulted in permanent modifications (approximately 2%) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The Treasury Report is attached hereto as Exhibit 6.

42.     By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, ASC is not only leaving homeowners in limbo, wondering if their home can be saved. ASC is also preventing homeowners from pursuing other avenues of resolution, including using the

---

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

*Wilfredo & Odalid Bosque*

43.     On January 17, 2006, Plaintiffs Odalid and Wilfredo Bosque obtained a sub-prime mortgage loan for their residence in Leominster from Accredited Home Lenders, Inc. ("Accredited").

44.     Mr. and Mrs. Bosque made the regularly scheduled payments on their loan for two years. In or about December 2007, Mrs. Bosque lost her job.  As a result, the monthly income of Mr. and Mrs. Bosque was severely lessened.  Shortly thereafter, the Bosques were unable to continue making regular mortgage payments.  Since that time, Mrs. Bosque has opened a daycare center from their home.  Mr. Bosque is employed as a corrections officer.

45.     Beginning in or around March 2008, the Bosques began an effort to obtain a loan modification through the servicer of their loan, Defendant ASC.

46.     Over several months, Mr. and Mrs. Bosque negotiated with Defendant ASC through its legal representative, Harmon Law Offices, P.C., ("Harmon") without success.

47.     In June 2009, Mr. and Mrs. Bosque, through counsel, requested that Defendant ASC consider their loan for modification under the HAMP program. Over the next three months, ASC repeatedly refused to admit that it was required by its participation in HAMP to allow the Bosques to apply for a HAMP loan modification.

48.     Although ASC never expressly retracted this position, Mr. and Mrs. Bosque received an offer in late August 2009 from ASC to enter into a HAMP TPP to run from October 2009 – December 2009.  The letter accompanying the TPP Agreement was dated August 28, 2009 and is attached as Exhibit 7.

49.     In order to qualify for their TPP, Mr. and Mrs. Bosque executed a TPP Agreement entitled "Home Affordable Modification Program Loan Trial Period," the first sentence of which stated: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

50.     The Trial Period Plan also states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  Although ASC, to date, has sent neither a signed copy of the Plan nor a written rejection to the Bosques, it accepted payments from Mr. and Mrs. Bosque under the TPP as described below.

51.     On September 29, 2009, Mr. and Mrs. Bosque returned two copies of the executed TPP Agreement, along with a hardship affidavit and the documents requested by Defendant ASC.  Copies of the executed TPP Agreement and hardship affidavit (partially redacted) are attached hereto as Exhibit 8.

52.     Mr. and Mrs. Bosque timely made each of the payments required by the TPP Agreement. Mr. and Mrs. Bosque have also continued to make monthly payments in 2010.  ASC accepted these payments without qualification and without notice of rejection of the TPP, thus demonstrating ASC's approval of the TPP and/or waiver of any right it might have to review documentation submitted in connection therewith.

53.     Despite their compliance in all respects with the terms of the TPP Agreement, the Bosques have not been offered a Loan Modification Agreement under the HAMP Program guidelines to date.

54.     Instead, Mr. and Mrs. Bosque have continued to receive account statements indicating that payment is currently due on the entire delinquent amount and that their HAMP modification is threatened because they have not submitted their paperwork.  A copy of a January 12, 2010 letter to this effect is attached hereto as Exhibit 9.  When Mr. and Mrs. Bosque called to inquire what paperwork is missing, they were informed by agents of Defendant ASC that there is no paperwork missing.  Mr. and Mrs. Bosque continue to receive other contacts from the ASC collections department.

55.     Like the other Plaintiff in this matter, Mr. and Mrs. Bosque have been living in limbo, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and their continued monthly payments under the TPP.  They have invested their limited resources in TPP payments based on the promise that doing so would result in a permanent loan modification.

*Germano DePina*

56.     Germano DePina resides at 5 Tupelo Street in Roxbury, Massachusetts with his wife and two-year old son.  He is employed as a union grocery warehouseman.

57.     On or about April 20, 2006, Mr. DePina refinanced his home with a sub-prime mortgage loan from Equifirst Corporation.

58.     ASC now acts as servicer on Mr. DePina's loan.

59.     Beginning in April 2009, Mr. DePina began making requests to ASC to evaluate him for a HAMP modification.

60.     From April 2009 through August 2009, ASC responded to Mr. DePina's requests by making repeated offers for non-HAMP permanent modifications of his loan.  Mr. DePina did not accept any of these offers because he believed he was entitled to be evaluated for HAMP.

61.     Finally, after Mr. DePina involved counsel, ASC sent him a TPP Agreement on August 11, 2009, indicating that he had until September 10, 2009 to execute and return the Agreement.  The cover letter that accompanied the TPP Agreement is attached hereto as Exhibit 10.

62.     Subsequently, Mr. DePina and his counsel had numerous telephone calls and email exchanges with several different ASC agents, including Branden Townsend in the loss mitigation department at telephone number 803-396-4108.

63.     During the discussion with Mr. DePina and his counsel, Mr. Townsend indicated that the monthly payment amount contained in the August 11, 2009 TPP Agreement was based on outdated income information contained in ASC's computer system.  Mr. Townsend encouraged Mr. DePina and his counsel to provide updated financial documentation to ASC.  Mr. DePina and his counsel did so.

64.     By agreement with Mr. Townsend, the deadline for Mr. DePina to respond to the ASC TPP Agreement was extended to October 1, 2009.

65.     On September 30, 2009, Mr. DePina returned his executed TPP Agreement.  Mr. DePina's acceptance reflected a revised TPP payment amount based on his updated financial information and the HAMP program documentation.  Included in Mr. DePina's submission, as requested by ASC, were executed copies of a Hardship Affidavit, IRS Form 4506-T, and supporting financial documentation (including, *inter alia,* paystubs, tax returns, and bank statements) as well as two copies of the executed, accepted TPP Agreement.  Mr. DePina also included a check for the first TPP payment in his September 30, 2009 submission.  A copy of the executed TPP Agreement Mr. DePina submitted on September 30, 2009 is attached hereto as Exhibit 11, along with partially redacted copies of the accompanying Hardship Affidavit, check for payment and hardship letter.

66. The August 11, 2009 Trial Period Plan offer states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."

67. Instead of either of these actions, ASC responded to Mr. DePina's September 30, 2009 acceptance of the TPP Agreement by sending Mr. DePina a second TPP Agreement on October 9, 2009, with a lower, revised TPP payment amount. A copy of the cover letter that accompanied the second TPP Agreement is attached hereto as Exhibit 12.

68. After contacting ASC in response to this new TPP Agreement, Mr. DePina was instructed that he did not need to resubmit the supporting documentation, but only needed to execute and return the second TPP Agreement itself.

69. In keeping with these instructions, Mr. DePina returned the executed TPP Agreement, on October 30, 2009 with a payment. A copy of the TPP Agreement submitted by Mr. DePina to ASC on October 30, 2009, along with a partially redacted copy of his payment and a cover letter, is attached hereto as Exhibit 13.

70. The second TPP Agreement executed by Mr. DePina was entitled "Home Affordable Modification Program Loan Trial Period," the first sentence of which stated: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

71. Mr. DePina's second Trial Period Plan also states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer." Although

ASC, to date, has sent neither a signed copy of the Plan nor a written rejection to Mr. DePina, it continues to accept payments from Mr. DePina under the TPP as described below.

72. Mr. DePina has timely made each of the payments required by the TPP Agreements. Mr. DePina has also continued to make payments beyond the three months contemplated by the second TPP Agreement. These payments were accepted without qualification by ASC.

73. Despite his compliance in all respects with the terms of the TPP Agreements, Mr. DePina has not been offered a Loan Modification Agreement under the HAMP Program guidelines to date.

74. On January 20, 2010, Mr. DePina received a letter indicating that Mr. DePina had failed to submit some unnamed "required document." Although the letter indicated that Mr. DePina had been unresponsive to previous attempts to gather this information, Mr. DePina was unaware of any such prior requests for documents.

75. After calling ASC to inquire about the January 20, 2010 letter, Mr. DePina was informed that ASC did not believe he had submitted an IRS Form 4506-T. To the contrary, Mr. DePina had submitted such a form with his September 30, 2009 package. Mr. DePina resubmitted the form, through counsel. A copy of this correspondence, partially redacted, is attached hereto as Exhibit 14.

76. Like the other Plaintiffs in this matter, Mr. DePina and his family have been living in limbo, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and their continued monthly payments under the TPP. They have invested their limited resources in TPP payments based on the promise that doing so would result in a permanent loan modification.

### *Class Allegations*

77. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

78.    This class action is brought by the Plaintiffs on behalf of themselves and all

Massachusetts homeowners whose loans have been serviced by Defendant and who, since April 13,

2009, have  complied with all their obligations under a written TPP, but have not received a

permanent HAMP modification.

79.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a)

and (b) of the Federal Rules of Civil Procedure.

80.    Plaintiffs do not know the exact size or identities of the members of the proposed class,

since such information is in the exclusive control of Defendant.  Plaintiffs believe that the class

encompasses many hundreds of individuals whose identities can be readily ascertained from

Defendant's books and records.  Therefore, the proposed class is so numerous that joinder of all

members is impracticable.

81.    Based on the size of the modifications at issue, Plaintiffs believe the amount in

controversy exceeds $5 million.

82.    All members of the class have been subject to and affected by the same conduct.  The

claims are based on form contracts and uniform loan modification processing requirements.  There

are questions of law and fact that are common to the class, and predominate over any questions

affecting only individual members of the class.  These questions include, but are not limited to the

following:

> a.   the nature, scope and operation of  Defendant's obligations to homeowners under
>
> HAMP ;
>
> b.   whether Defendant's receipt of an executed TPP Agreement, along with
>
> supporting documentation and three monthly payments, creates a binding contract or

otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

c.  whether Defendant's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

d.  whether the Court can order damages and enter injunctive relief.

83.  The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

84.  The individual named Plaintiffs will fairly and adequately represent the interests of the class.  They are committed to the vigorous prosecution of the class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

85.  A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

86.  This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

87.  The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
### *Breach of Contract*

88.     Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

89.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

90.     As described above, the TPP Agreement sent by Defendant to Plaintiffs constitutes a valid offer.

91.     By executing the TPP Agreement and returning it to Defendant along with the supporting documentation, Plaintiffs accepted Defendant's offer.

92.     Alternatively, Plaintiffs' return of the TPP Agreement constitutes an offer.  Acceptance of this offer occurred when Defendant accepted Plaintiffs' TPP payments.

93.     Plaintiffs' TPP payments to Defendant constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

94.     Plaintiffs and Defendant thereby formed valid contracts.

95.     To the extent that the contracts were subject to a condition subsequent providing ASC an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP, this condition was waived by ASC and/or it is estopped to assert it as a defense to Plaintiffs' claims.

96.     By failing to offer Plaintiffs permanent HAMP modifications, Defendant breached those contracts.

97.     Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

98.     Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breach.  By making TPP payments both during and after the TPP, Plaintiffs forego other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy

code, or pursuing other strategies to deal with their default, such as selling their home. On information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

COUNT II

***Breach of the Implied Covenant of Good Faith and Fair Dealing***

99.     Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

100.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

101.    Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

102.    "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

103.    Defendant routinely and regularly breaches this duty by:

    a.  failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

    b.  failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

    c.  routinely demanding information already in its files;

    d.  making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

    e.  failing to follow through on written and implied promises;

    f.  failing to follow through on contractual obligations; and

18

g.  failing to give permanent HAMP modifications and other foreclosure alternatives to qualified Plaintiffs.

104.    As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiffs harm.

COUNT III
*Promissory Estoppel, in the alternative*

105.    Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

106.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

107.    Defendant, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation, and made their TPP payments, they would receive a permanent HAMP modification.

108.    Defendant's TPP Agreement was intended to induce Plaintiffs to rely on it and make monthly TPP payments.

109.    Plaintiffs did indeed rely on Defendant's representation, by submitting TPP payments.

110.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

111.    Plaintiffs reliance was to their detriment.  Plaintiffs have yet to receive permanent HAMP modifications and have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.      Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members;

c.      Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.      Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

g.      Award actual and punitive damages to the Plaintiffs and the class;

h.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

i.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiffs

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue

Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-9595 (*telephone*)
(617) 542-8010 (*fax*)

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE:  February 23, 2010