**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **WILFREDO and ODALID BOSQUE, VERA VICENTE MEEK, and JENNIFER WILLIAMS, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) ) | **C.A. NO. 10-10311** |
| **Plaintiffs,** vs. | ) ) ) | **Leave to File Granted August 11, 2010** |
| **WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY,** | ) ) ) ) ) | |
| **Defendant.** | ) ) ) ) | |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF
WELLS FARGO BANK, N.A.**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ......................................................................................1

II.     BACKGROUND:  LANGUAGE OF THE CONTRACT AND
        PLAINTIFFS' ALLEGATIONS ..............................................................3

III.    LEGAL STANDARD ...............................................................................6

IV.     ARGUMENT ............................................................................................7

        A.      Wells Fargo Mischaracterizes Plaintiffs' Legal Position ..........7

                1.      The HAMP Cases Wells Fargo Cites Have No Bearing on
                        a Claim for Breach of the TPP Agreement between Wells
                        Fargo and its Borrowers.......................................................7

                2.      Wells Fargo Distorts Plaintiffs' Position Regarding
                        Eligibility............................................................................10

        B.      Plaintiffs Have Stated a Claim for Breach of Contract............12

                1.      Plaintiffs Have Adequately Alleged Consideration ......12

                2.      Plaintiffs Sufficiently Allege Damages ...........................16

                3.      The TPP Agreements Are Complete, Enforceable
                        Contracts.............................................................................19

        C.      Plaintiffs Have Stated a Claim for Breach of the Covenant of
                Good Faith and Fair Dealing .......................................................21

        D.      Plaintiffs Have Made Allegations Sufficient to Entitle Them to
                Relief Based Upon Promissory Estoppel.....................................23

        E.      Plaintiffs State a Claim for Relief Under G.L. c. 93A .............24

                1.      Analyzed Under the Correct Standard, the Complaint
                        Adequately Alleges Unfair and Deceptive Practices....24

                2.      Plaintiffs Met the Demand Letter Requirement of G.L. c.
                        93A.......................................................................................27

V.      CONCLUSION ......................................................................................29

# TABLE OF AUTHORITIES

Page

## Cases

*Aleem v. Bank of America*,
 No. EDCV 09-01812, 2010 WL 532330 (C.D. Cal. Feb. 9, 2010) ........................................ 8

*Ayres v. Gen. Motors Corp.*,
 234 F.3d 514 (11th Cir. 2000) ........................................................................................... 8

*Baldassari v. Public Fin. Trust*,
 369 Mass. 33 (1975) ................................................................................................... 27, 29

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ........................................................................................................... 6

*Broder v. Cablevisions Sys. Corp.*,
 418 F.3d 187 (2d Cir. 2005) .............................................................................................. 8

*Brooks v. White*,
 43 Mass. 283 (1841) ........................................................................................................ 15

*Bucholz v. Green Bros. Co.*,
 272 Mass. 49 (1930) ........................................................................................................ 17

*Cavanaugh v. U.S. Government*,
 640 F. Supp. 437 (D. Mass. 1986) .................................................................................. 24

*Chalfin v. Beverly Enterprises, Inc.*,
 741 F. Supp. 1162 (E.D. Pa. 1989) ................................................................................... 9

*Clark v. Gulesian*,
 197 Mass. 492 (1908) ...................................................................................................... 17

*Commonwealth v. DeCotis*,
 366 Mass. 234 (1974) ...................................................................................................... 26

*Commonwealth v. Fremont Investment & Loan*,
 452 Mass. 733 (2008) ...................................................................................................... 10

*Daddario v. City of Pittsfield*,
 301 Mass. 552 (1938) ...................................................................................................... 16

*Deposit Guaranty Nat. Bank v. Roper*,
 445 U.S. 326 (1980) ......................................................................................................... 29

*Emerson v. Deming*,
 304 Mass. 478 (1939) ...................................................................................................... 16

*Evans v. Yegen Associates, Inc.*,
 556 F. Supp. 1219 (D. Mass. 1982) ................................................................................. 17

*Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*,
 15 Mass. App. Ct. 992, 448 N.E.2d 70 (1983) ................................................................ 12

*FAMM Steel, Inc. v. Sovereign Bank*,
 571 F.3d 93 (1st Cir. 2009) ............................................................................................ 23

*Gaitan v. Mortgage Elec. Registration Sys.*,
 No.  EDCV 09-1009-VAP, 2009 WL 3244729 (C.D. Cal. Oct. 5, 2009) .............................. 8

*George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*,
 283 Mass. 383 (1933) ...................................................................................................... 21

*Grossman v. Waltham Chem. Co.*,
 14 Mass. App. Ct. 932 (1982) .......................................................................................... 26

*Hacker v. Nitschke*,
 310 Mass. 754 (1942) ...................................................................................................... 16

*Hagan v. Riley*,
 13 Gray 515 (Mass. 1859) ............................................................................................... 17

*Hoffman v. Bank of America*, *N.A.*,
 No. C-10-2171-SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010) ..................................... 7

*In re Lloyd, Carr and Co.*,
 617 F.2d 882 (1st Cir. 1980) ............................................................................................ 15

*Ionco v. Jensen Constr. Co.*,
 622 F.2d 1291 (8th Cir. 1980) ........................................................................................... 9

*Liss v. Studeny*,
 450 Mass. 473 (2008) ...................................................................................................... 23

*Marine Contractors Co., Inc. v. Hurley*,
 365 Mass. 280 (1974) ...................................................................................................... 15

*Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.*,
 420 Mass. 39 (1995) ........................................................................................................ 24

*Massachusetts v. Mylan Laboratories*,
 608 F. Supp. 2d 127 (D. Mass. 2008) ............................................................................... 23

Moss v. Camp Pemigewassett,
 312 F.3d 503 (1st Cir. 2002) .............................................................................................. 6

*Richards v. Arteva Specialties S.A.R.I.*,
 66 Mass. App. Ct. 726 (2006) .......................................................................................... 27

*Singarella v. City of Boston*,
 342 Mass. 385 (1961) ...................................................................................................... 17

*Speakman v. Allmerica Financial Life Ins.*,
 367 F. Supp. 2d 122 (D. Mass. 2005) ......................................................................... 21, 23

*States Resources Corp. v. The Architectural Team, Inc.*,
 433 F.3d 73 (1st Cir. 2005) .............................................................................................. 24

*Swanson v. Bankers Life Co.*,
 389 Mass. 345 (1983) ...................................................................................................... 25

*T.W. Nickerson, Inc. v. Fleet Nat. Bank,*
   456 Mass. 562 (2010) .............................................................................. 21

*Targus Group Intern., Inc. v. Sherman,*
   76 Mass. App. Ct. 421 (2010) ................................................................ 21

*Tufankjian v. Rockland Trust Co.*
   57 Mass. App. Ct. 173 (2003) ................................................................ 22

*Turnpike Motors, Inc. v. Newbury Group, Inc.,*
   413 Mass. 119 (1992) .............................................................................. 23

*U.S. v. Boston Scientific Corp.,*
   167 F. Supp. 2d 424 (D. Mass. 2001) .................................................... 20

*United States v. President and Fellows of Harvard College,*
   323 F. Supp. 2d 151 (D. Mass. 2004) ............................................... 9, 20

*V. & F.W. Filoon Co. v. Whittaker Corp.,*
   12 Mass. App. Ct. 932, 425 N.E.2d 399 (1981) ................................... 12

*Weiner v. Pictorial Paper Package Corp.,*
   303 Mass. 123 (1939) .............................................................................. 21

*Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc.,*
   56 Mass. App. Ct. 853 (2002) .................................................................. 9

*Williams v. Geithner,*
   No. 09-1959, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009) ................ 7

*Wit v. Commercial Hotel Co.,*
   253 Mass. 564 (1925) .............................................................................. 13

**Statutes**

12 U.S.C. § 5211 ............................................................................................ 1

G.L. c. 93A.......................................................................................... passim

**Other Authorities**

Black's Law Dictionary (8th ed. 2004)....................................................... 14

Restatement (Second) of Contracts............................................... 12, 14, 22

Samuel Williston, *A Treatise on the Law of Contracts* (4th ed. 2008)....................................................... 13

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................. 6

**Regulations**

940 C.M.R. § 3.16 ....................................................................................... 25

Plaintiffs Wilfredo and Odalid Bosque, Vera Vicente Meek, and Jennifer Williams, on behalf of themselves and all others similarly situated ("Plaintiffs") hereby oppose the Motion to Dismiss of Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo").

## I.    INTRODUCTION

The goal of this case is to limit and rectify the harm done by Wells Fargo's practice of routinely breaking its promises made in written contracts to modify mortgages.  Unnecessary and inappropriate foreclosures on Massachusetts families have resulted and scores more are threatened.  Absent a remedy in this Court, Wells Fargo's failure to honor its obligations will continue to have tragic consequences.  What is at stake here is nothing less than peoples' homes.

In 2009, recognizing a national economic calamity of unprecedented scope, the federal government created a program – the Home Affordable Modification Program or "HAMP" -- explicitly designed to prevent foreclosures.  For privately held loans, participation by mortgage servicers in this program was voluntary and indeed, Wells Fargo signed up to participate.[1]  The aim of the program is to facilitate the modification of home mortgage loans.  Such modifications are intended to make home mortgages affordable for borrowers who have already defaulted or who attest to an imminent risk of default.  The form contract that lies at the heart of this case, known as the Trial Period Plan ("TPP") Agreement, draws on HAMP as the source of its governing principles.

Plaintiffs in this matter are united by a common factual circumstance – each of them was determined by Wells Fargo to be eligible and qualified for a Home Affordable Modification,[2]

---

[1] Although Wells Fargo's participation was voluntary, it was done against the backdrop of its acceptance of $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  *See* Complaint [Docket No. 10] ("FAC" or "Complaint") at ¶ 3.

[2] "Home Affordable Modification" is a technical term used in the TPP Agreements and refers to a permanent loan modification the terms of which are determined in accordance with the HAMP Program Documentation.  *See* discussion in Section A. 3, *infra*.

and each executed a binding TPP Agreement with Wells Fargo with an explicit bargained-for

exchange -- if a homeowner complied with their TPP Agreement, Wells Fargo promised to

tender them a permanent loan modification with definite terms upon completion of the three-

month trial period.  Each of the named plaintiffs delivered on their end of the bargain –

complying with the TPP Agreement's certifications, making the contractually required payments

and providing the documentation requested, which verified their eligibility.  Yet none of the

Plaintiffs were tendered permanent modification offers upon completion of the three-month trial

period, as promised.

        Wells Fargo's moving papers are built upon a fundamental and inappropriate

mischaracterization of Plaintiffs' legal position.  Wells Fargo repeatedly describes the "premise

of the lawsuit" as a "guarantee" that "every borrower whose loan is modified on a trial basis

receive a permanent modification."  Mot. at 8.  This is simply not true.  The named plaintiffs

have pled entitlement to permanent modifications based on their execution, compliance with and

performance under their TPP Agreements, not on the existence of the Agreement alone.  That

there may be Wells Fargo borrowers in TPP Agreements who ultimately are not eligible for

permanent modifications is a factual issue for class certification and is not appropriate for

resolution at this stage of the case.

        Further, Wells Fargo distorts the timeline under which TPP Agreements are offered.

Contrary to Wells Fargo's assertions, TPP Agreements are only given to borrowers who are

determined eligible for HAMP and pass the Net Present Value ("NPV") test[3] on the basis of the

information they initially report.  The TPP Agreements state that borrowers who fail to provide

verification for the oral information used to find them eligible, or whose representations are not

---

[3] The NPV test, discussed in more detail below, is a threshold eligibility determination that a HAMP modification will be in the financial interest of the owner of the loan, on whose behalf Wells Fargo is acting.

true in any material respect *are not in compliance with the TPP Agreement*.  FAC, Ex. 9 at 1-2.

Each Plaintiff alleges that he or she complied with *all* conditions of the TPP Agreement --

meaning they have provided verification of all information that was used to find them eligible for

HAMP, that their information was truthful and correct, and that they have made their required

trial payments. FAC at ¶¶ 52-54, 68-71, 84, 87-89.  Such borrowers necessarily will qualify for a

Home Affordable Modification at the close of the Trial Period.

      Wells Fargo's other arguments are also flawed.  Plaintiffs have alleged facts sufficient to

support their legal claims of breach of contract, breach of the covenant of good faith and fair

dealing, promissory estoppel and violation of G.L. c 93A, and those claims should not be

dismissed.

## II.      BACKGROUND:  LANGUAGE OF THE CONTRACT AND PLAINTIFFS' ALLEGATIONS

      The TPP Agreements that lie at the center of this dispute are form contracts between

Plaintiffs and the servicer of their mortgages.  The relevant language is identical for each

borrower.  *See* FAC Exhibits 7, 8, 9, 10.[4]  The promise on which Plaintiffs' claims rest is the first

sentence of the TPP Agreement:

> If I am in compliance with this Trial Period Plan, and my representations
> in Section 1 [regarding verification of information] continue to be true in
> all material respects, then the Lender will provide me with a Home
> Affordable Modification Agreement ("Modification Agreement"), as set
> forth in Section 3. . . .

FAC, Ex. 9 at 1.

      This promise is repeated and referenced in different forms and at different places

throughout the TPP Agreement.  For example, Section 2(G) states:

---

[4] For convenience, this Opposition will cite to the TPP Agreement attached to the FAC as Exhibit 9.
Exhibits 7, 8, and 10 are also TPP Agreements and contain the same language.

> I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements of this Plan.

And again, Section 3 states:

> If I comply with the requirements in Section 2 [i.e., regarding payment], and my representations in Section 1 [i.e., regarding certifications identified below], continue to be true in all material respects, the Lender *will send me a Modification Agreement* for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

(emphasis added).

Last, Wells Fargo's implied assertion in its Memorandum that it is entitled to an ongoing period beyond the three-month trial period in which to continue evaluating Plaintiffs' eligibility is belied by the express language of the TPP Agreement itself.  *See* FAC, Ex. 9 at § 2(A) ("TIME IS OF THE ESSENCE" ).

Each Plaintiff was uniformly affected by Wells Fargo's conduct.  Each of the named plaintiffs completed the HAMP application process, were determined initially eligible for a HAMP modification, passed the NPV test and were tendered TPP Agreements.  FAC at ¶¶ 48-51 (Bosque), ¶¶ 64-67 (Meek), ¶ 83 (Williams).  Indeed, in its moving papers, Wells Fargo acknowledges that it determined that each of the named plaintiffs were eligible for HAMP prior to tendering each a TPP Agreement.  *See* Memorandum in Support of Motion to Dismiss ("Mot.") at 5-7 (stating, for each named plaintiff that "Wells Fargo notified [the plaintiff(s)] that [they] were eligible for HAMP").  Each of the named plaintiffs executed and returned the TPP Agreement that was offered to them.  FAC at ¶ 52 (Bosque), ¶ 68 (Meek), ¶ 84 (Williams).  Each of the named plaintiffs made the payments called for under the TPP Agreement, and indeed, continued payments after the TPP ended.  FAC at ¶ 53 (Bosque), ¶ 69 (Meek), ¶ 87 (Williams).  Last, all named plaintiffs fully complied with all documentation requests made to them, FAC at ¶

4

52 (Bosque), ¶ 70 (Meek), ¶ 88 (Williams), and with all other terms of the TPP Agreements. FAC at ¶ 54 (Bosque), ¶ 71 (Meek), ¶ 89 (Williams).[5]

Based on their eligibility and performance under the TPP Agreements, Wells Fargo was required to tender each named plaintiff a permanent loan modification. The parties agreed that the payment terms for the modification would be determined according to guidelines established under HAMP and that the effective of the permanent modification would be the first day of the month following the trial period.[6] Wells Fargo not only failed to tender permanent modifications to the named Plaintiffs by the close of the trial period, it also neglected to send Plaintiffs any written decision within that timeframe. FAC at ¶ 54-56 (Bosque), ¶ 72 (Meek), ¶ 89-92 (Williams).[7] Instead, Plaintiffs were the targets of redundant, ambiguous and threatening demands for documents. FAC at ¶ 55 (Bosque), ¶ 73 (Meek), ¶ 93 (Williams). Plaintiffs have also been subjected to a range of foreclosure activity against their homes, including improper foreclosure threats and processes, *see* FAC at ¶¶ 73 (Meek). Other similarly situated borrowers have experienced foreclosure auctions conducted at Wells Fargo's direction, purporting to sell their homes.[8]

---

[5] The parties have stipulated to amend the complaint to include the claims of additional, similarly situated borrowers who have more recently come forward, including Gary Voltaire and Jennifer Ryan Voltaire ("the Voltaires") [Docket No. 22] and Paul Montero ("Montero"). The parties have agreed that this amendment should not moot or otherwise disturb the briefing of Wells Fargo's motion to dismiss.

[6] This timeframe is established by the TPP Agreement, which defines the "Modification Effective Date" as the first day of the month following the month in which the last Trial Period Payment is due, provides that "time is of the essence under this plan" and requires that the borrower receive the Modification Agreement prior to the Modification Effective Date. *See* FAC, Ex. 9 at 2.

[7] Following the commencement of this litigation, Wells Fargo tendered a permanent modification offer to the Bosques. For reasons that have not yet been explained by Wells Fargo, however, the permanent modification included a materially higher monthly payment than the estimate embodied in the TPP Agreement. The parties continue to seek a resolution for this variance.

[8] The Voltaires were foreclosed on despite compliance with their TPP Agreement. As a result, the Voltaires filed an emergency motion seeking intervention into this case [Docket No. 18]. Their factual situation, explained more fully in their filings of July 23, 2010 [Docket Nos. 18-21], is virtually identical to that of the named plaintiffs, except that they were also targeted by Wells Fargo for an improper

### III.   LEGAL STANDARD

In order to survive a motion to dismiss, the complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). In making this determination, the Court "must accept all well-pleaded facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Moss v. Camp Pemigewassett*, 312 F.3d 503, 506 (1st Cir. 2002) ("*Moss*"). If the facts as pled allow the Court to draw a reasonable inference that the Defendant is liable for alleged misconduct, the motion to dismiss must be denied. *Id.* Such is the case here.

Repeatedly, Wells Fargo's memorandum ignores the standard for dismissal under Fed. R. Civ. P. 12(b)(6), inappropriately disputing multiple allegations of the Complaint. As discussed above, Wells Fargo's repeated speculation that some Plaintiffs may ultimately be ineligible for permanent loan modifications, *see* Mot. at 2, 8-12, is inconsistent with the requirement that factual allegations in the Complaint must be taken as true for the purposes of this motion. Similarly, Wells Fargo's assertion that none of the named Plaintiffs were subjected to foreclosure activity during their Trial Periods, *see* Mot. at 19 & n.9, is flatly contradicted by facts before the Court. *See supra* at n.8.

### IV.   ARGUMENT

#### A.   Wells Fargo Mischaracterizes Plaintiffs' Legal Position

Wells Fargo's motion misleads the Court in at least two important respects. First, Plaintiffs have not brought suit to enforce HAMP based on either a third-party beneficiary or a due process claim. The cases cited by Wells Fargo in this regard have no relevance to this matter. *See* Mot. at 8-10. Nor is Wells Fargo's citation to opinions deciding whether HAMP or

---

foreclosure. Montero presents similar facts, although the foreclosure activity against his home have not yet consummated in a sale.

its enabling legislation contain a private right of action at all useful to the Court here.  *See* Mot. at 10.  Rather, Plaintiffs assert breach of contract claims for violations of the TPP Agreements between themselves and Wells Fargo.

Second, Plaintiffs do not assert, as Wells Fargo suggests, that every borrower who executes a TPP Agreement is automatically entitled to a permanent loan modification.  There may be limited situations – not at issue here - where Wells Fargo might legitimately deny a borrower after the TPP Agreement has been executed.

> ***1.*** ***The HAMP Cases Wells Fargo Cites Have No Bearing on a Claim for Breach of the TPP Agreement between Wells Fargo and its Borrowers***

Not a single one of the HAMP cases cited by Wells Fargo turns on the form contract that is at the center of this dispute.  Instead, the cases cited by Wells Fargo stand for one of three propositions.  First, Wells Fargo cites opinions that have rejected claims based on due process rights stemming from an alleged property interest in a modification prior to any TPP Agreement being offered.  *See, e.g., Williams v. Geithner*, No. 09-1959, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009).  Plaintiffs do not bring that claim.  Second, Wells Fargo cites cases brought on the theory that the contract *between the servicer and the Treasury Department* is intended to benefit borrowers.  *See, e.g., Hoffman v. Bank of America, N.A.,* No. C-10-2171-SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010).  Plaintiffs here have not brought that claim either.  The contracts at issue in the Complaint are altogether different – they are the agreements directly between the borrowers and Wells Fargo.  Third, Wells Fargo cites cases holding that HAMP and its enabling legislation does not provide for a private right of action.  *See, e.g., Gaitan v. Mortgage Elec. Registration Sys.*, No.  EDCV 09-1009-VAP, 2009 WL 3244729 (C.D. Cal. Oct. 5, 2009).  Plaintiffs do not seek to enforce HAMP directly, but rather seek to enforce the

contracts that promise them a permanent HAMP modification in the circumstances present here.[9]

Wells Fargo's position that the lack of a private cause of action in HAMP bars this suit –
which is based in common law and Massachusetts' consumer protection statute -- is misleading
and wrong.  It is clear that Plaintiffs have not brought a cause of action under HAMP because
their claims do not arise unless and until the TPP Agreement is breached.[10]  It is the contract –

---

[9] Further, Wells Fargo's reliance on *Aleem v. Bank of America*, No. EDCV 09-01812, 2010 WL 532330 at *3, (C.D. Cal. Feb. 9, 2010) and similar cases is entirely misplaced. Mot. at 10-11.  In *Aleem*, the court determined that the plaintiffs did not state a federal cause of action by pleading a violation of HAMP under the California Business and Professions Code – a statutory enforcement mechanism that is not at issue here.  To suggest, as Wells Fargo does, that these cases abrogate Wells Fargo's independent responsibility to meet obligations under its agreements distorts their reading beyond recognition.  Such a position would free Wells Fargo to violate contracts that relate even remotely to federal law without consequence. The claim here at issue is a freestanding breach of contract – as a cause of action, it is not dependent on HAMP.  That HAMP informs and provides context to the terms of the contract is of no consequence.

[10] The cases cited by Wells Fargo on this point are unpersuasive.  *See* Mot. at 11-12, *citing Brown v. First Tenn. Nat'l Ass'n, C.A. No.* 1:09-CV-0679-BBM (N.D. Ga. Nov. 20, 2009); *Broder v. Cablevisions Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005); and *Ayres v. Gen. Motors Corp.*, 234 F.3d 514 (11th Cir. 2000). *Brown* is an unpublished civil RICO opinion from a foreign jurisdiction that expressly rests on narrow, case-specific facts, bound up in the "controversial" civil RICO scheme.  *See Brown* Slip Op. at 27. Under this scheme, the court found that the guidelines cited as the basis for alleged RICO violations were not included on the "discrete list of federal statutes, the violation of which constitutes racketeering activity." *Id.* at 25.  *Brown* relies heavily on *Ayres*, which is another civil RICO opinion.  Nothing of the sort is at issue here, where Plaintiffs bring a straightforward common law breach of contract action based on an agreement between themselves and the Defendant.  In *Broder*, the plaintiff's cable television agreement allowed that his programming rates were "subject to change in accordance with applicable law." *Broder*, 418 F.3d at 196-97.  Mr. Broder attempted to fashion this statement into a breach of contract claim on the basis that he believed the company had violated federal law requiring cable companies to provide uniform rates and disclose their rates properly.  The Second Circuit ruled that Mr. Broder's claimed violations of federal law were not covered by the contract language regarding rate changes that he sought to enforce.  *Id.*, 418 F. 3d at 197-98.  To the extent that the *Broder* court found that the absence of a private right of action in federal law mattered at all, it was interpreting a contract provision that promised nothing more specific than compliance with law globally.  In this context, *Broder* cited the notion that courts should not strain to find that a violation of a federal law constitutes a state law cause of action if none otherwise exists. *Id.*, 418 F. 3d at 198.  But here, the contract at issue requires no straining.  The existence of the contractual duty – i.e., the duty to provide a permanent loan modification to those who comply with their TPP Agreements -- is far more specific and concrete than complying globally with law, and the breach– i.e., the failure to so provide such modifications -- does not necessarily depend on reference to HAMP.  Whether Wells Fargo violated HAMP rules or not, it is clear that it breached the TPP Agreement.

not HAMP – that Plaintiffs seek to enforce.[11]  Of course, the contract was formed in the context

of Wells Fargo's participation in HAMP, and thus the program provides background necessary to

understand the terms of the TPP Agreement.  *See* Section II, *supra*.  Yet, it is black letter law that

the Court is free to look to extrinsic sources to supply a reasonable construction of an ambiguous

or missing term in a contract.  *See United States v. President and Fellows of Harvard College*,

323 F. Supp. 2d 151, 172 (D. Mass. 2004) (Court allowed extrinsic evidence to resolve the

meaning of a term in a cooperative agreement between parties).

Further, the Court is free to look to the standards laid out by HAMP as a source for

determining whether Wells Fargo has acted unfairly or deceptively under G.L. c. 93A.  Such a

source need not be independently enforceable or contain a private right of action in order for a

93A claim to stand. *See Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc.*, 56 Mass. App.

Ct. 853, 858 (2002)  ("Violation of a specific statute that does not itself permit private recovery

may give rise to private claim under c. 93A if the violation amounts to an unfair method of

competition or an unfair or deceptive practice independently prohibited by G.L. c. 93A, §2, and

if recovery under c. 93A is compatible with the objectives and enforcement mechanisms the

underlying statute contains.")  Indeed, Massachusetts courts regularly look to federal sources of

law that are not independently enforceable as a means of determining the standard governing

unfairness under G.L. c. 93A.  *See Commonwealth v. Fremont Investment & Loan,* 452 Mass.

733, 744-46 & n.20 (2008) (citing, *inter alia*, an advisory letter from the Office of the

---

[11] Simply because the contract at issue here was made as part of a federal program, drawing on that
program as the source of certain principles of the agreement, does not render it unenforceable.  Were the
case otherwise, a court would not be able to enforce a contract touching on issues of federal law, where
that law was devoid of a private right of action.  This is not so.  *See, e.g., Chalfin v. Beverly Enterprises,
Inc.*, 741 F. Supp. 1162, 1178 (E.D. Pa. 1989) (ruling that genuine issues of material fact exist on claim
for breach of nursing home resident's contract made in context of federal and state health care laws that
did not contain a private cause of action).  *See also Ionco v. Jensen Constr. Co.*, 622 F.2d 1291, 1296 (8th
Cir. 1980) (ruling that a state "is certainly free to look to the provisions of a federal statute for guidance in
applying its longstanding common law remedies").

Comptroller of the Currency and a cease and desist order from the FDIC).

### 2.   *Wells Fargo Distorts Plaintiffs' Position Regarding Eligibility*

The second important manner in which Wells Fargo distorts Plaintiffs' claims involves

the question of eligibility.  With its characterization of Plaintiffs' position, Wells Fargo suggests

that a borrower's evaluation for HAMP remains open-ended after the TPP Agreement has been

executed by the borrower.  This is not so.  The Complaint describes the HAMP as involving a

two-step process in which the borrower is determined eligible for HAMP based on information

collected by Wells Fargo prior to the TPP Agreement being sent.  FAC ¶¶ 39-40.  In other words,

if a borrower has received a TPP Agreement, he has already been determined initially eligible for

the program.  FAC, Ex. 2 at 17-18.[12]  That determination is subject to confirmation in the form of

the trial period, during which Wells Fargo is responsible for validating the information that it

used to decide eligibility if it has not already done so, and the borrower is given the opportunity

to show that it can make the estimated payments for three months.  *Id.*  If the information on

which the initial decision was made is verified as accurate the borrower is necessarily still

---

[12] Wells Fargo's characterization of the timing of eligibility determinations is misleading.  On page 4 of its brief, Wells Fargo asserts that servicers had formerly been permitted to "place a borrower on a three-month trial period plan before the servicer had obtained information from the borrower necessary to make a final determination as to whether the borrower was eligible for a permanent modification as determined by application of the waterfall and the net present value test."  The citation for this statement is to a sentence in the Treasury Directives describing the servicer's ability to *verify* information that it has already collected prior to the TPP Agreement being offered.  *See* Mot. at 4, *citing* SD 09-01 at 5, 17. Properly understood, eligibility (including the running of an NPV Test with a positive outcome and a determination of an appropriate monthly payment under the waterfall) is determined prior to Wells Fargo's tender of a TPP Agreement, and is merely verified during the trial period. *See* FAC, Ex. 2 at 5-6. "Servicers may use recent verbal financial information obtained from the borrower and any co-borrower 90 days or less from the date the servicer is determining HAMP eligibility *to assess the borrower's eligibility*. The servicer *may rely on this information to prepare and send to the borrower* a solicitation for the HAMP and *an offer of a Trial Period Plan*. . . . As an alternative, a servicer may require a borrower to submit the required documentation to *verify the borrower's eligibility and income prior to preparing a Trial Period Plan*." *Id.* (emphasis added).

eligible for a HAMP modification. *See* FAC, Ex. 2 at 18.[13]  If the borrower also makes all three of her payments during the trial period, as is the case with the named plaintiffs and the putative class, then Wells Fargo is required by the TPP Agreement to tender the permanent modification. The contract at issue so states, *see* Section II, *supra.*  The named plaintiffs and the putative class here consists of borrowers who have fully complied with the terms of the TPP Agreement and have therefore met the conditions necessary to receive permanent modifications.

Most importantly for present purposes, the nature of Wells Fargo's attack is wholly inappropriate at this stage of the litigation.  Wells Fargo's distortion is based on its speculation that "not all borrowers are eligible for a permanent HAMP modification . . . ."  Mot. at 8.  The named plaintiffs however, have described with particularity their specific entitlement to permanent modifications on the basis of their compliance with the terms and conditions of the TPP Agreements.  These facts must be accepted as true for the purposes of the present motion.  If one or more of the named plaintiffs is ineligible for a permanent modification based on a disparity between the information used to determine eligibility and the verification documents, Wells Fargo surely will have ample opportunity to so demonstrate as the case progresses.[14,15]

---

[13] Even if the original qualifying information is later determined to be inaccurate by a margin of 25% or less, the same TPP Agreement may remain in effect. *See* FAC, Ex. 2 at 18.

[14] Wells Fargo has asserted that Ms. Meek is ineligible for a permanent modification on the basis of a negative NPV test result, despite the fact that none of her financial circumstances affecting the test that Wells Fargo had run before offering her the TPP Agreement have changed during her trial period.  Wells Fargo also asserts that Ms. Williams is ineligible for reasons that it fails, even now, to explain.  Mot. at 6-7.  These disagreements over questions of fact are not suitable for adjudication on a motion to dismiss, where the Court must accept the well-pleaded facts of the Complaint as true.  *See Moss*, 312 F.3d at 506.

[15] Although inquiry into these matters is not yet appropriate, Plaintiffs concede that there may exist a limited number of Wells Fargo borrowers – not including themselves --who will not ultimately be eligible to execute permanent modifications because of a change in circumstances that occurs during the trial period.  Such borrowers would be ineligible to execute permanent modifications because the form contract used to effect permanent modifications – not yet a part of the record in this case – requires the borrowers to certify that the information on which their eligibility was determined continues to be true in all material respects.  This issue will be part of the parties' class certification briefing.

### B.      Plaintiffs Have Stated a Claim for Breach of Contract

#### 1.      *Plaintiffs Have Adequately Alleged Consideration*

The TPP Agreement is supported by legally sufficient consideration. The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee. *Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*, 15 Mass. App. Ct. 992, 993, 448 N.E.2d 70, 73 (1983) (citing Restatement (Second) of Contracts § 73, Cmt. b (1979)).  The adequacy of the consideration (its monetary value) is not relevant, so long as there is some consideration.   *V. & F.W. Filoon Co. v. Whittaker Corp.*, 12 Mass. App. Ct. 932, 933, 425 N.E.2d 399, 400 (1981).

Plaintiffs have adequately alleged consideration here, both in the form of a benefit to the promisor and in the form of a detriment to the promisee. Plaintiffs' allegations that they made payments in an amount and manner different from that required by their pre-existing loan documents and complied with the other terms of the TPP Agreements, all of which actions were requested by Wells Fargo and none of which were pre-existing legal obligations, are sufficient to establish consideration for Wells Fargo's promises to provide Home Affordable Modifications.

Compliance with the TPP Agreement results in legal detriment to the Plaintiffs of two types.  First, the borrower is required to provide extensive financial information, make binding representations concerning his or her personal circumstances and agree to undergo credit counseling.  FAC, Ex. 9 at 1.  The borrower may also be required to make payments into a newly established escrow account, if one did not already exist.  FAC, Ex. 2 at 11.  Satisfaction of these conditions was requested of Plaintiffs by Wells Fargo in the TPP Agreement, and, as discussed below, they improve Wells Fargo's position for the purposes of underwriting the modification and for ultimate payment of the loan as modified.  Before entering into the TPP Agreements, Plaintiffs had no obligation to fulfill these conditions.  Thus, they are legal detriments to the

Plaintiffs – completely apart from any payment of money towards the pre-existing debt – and

constitute consideration for Wells Fargo's promises to provide Home Affordable Modifications.

"[I]t is a sufficient *legal* detriment to the promisee if it promises or performs any act, regardless

of how slight or inconvenient, which it is not obligated to promise or perform so long as it does

so at the request of the promisor and in exchange for the promise."  Samuel Williston, *A Treatise

on the Law of Contracts* §7:4 (4th ed. 2008) (emphasis in original).  *See also*, *Wit v. Commercial

Hotel Co.*, 253 Mass. 564, 572 (1925) ("It would be a detriment to the promisee, in a legal sense,

if he, at the request of the promisor and upon the strength of that promise, had performed any act

which occasioned him the slightest trouble or inconvenience, and which he was not obliged to

perform.")

Second, the fact that Plaintiffs are required to make payments in specific amounts

requested by Wells Fargo and differing from their prior obligation independently satisfies the

requirement of consideration (and further distinguishes this case from the partial payment cases

discussed below).  The TPP Agreement is an exchange of mutual promises to alter the timing

and conditions of payment of a debt.  Such mutually agreed changes in performance constitute

consideration:

> Performance of a legal duty owed to a promisor which is neither doubtful nor the
> subject of honest dispute is not consideration; *but a similar performance is
> consideration if it differs from what was required by the duty in a way which
> reflects more than a pretense of bargain*.

Restatement (Second) of Contracts § 73 (emphasis added; Williston, *supra*, §7:27 ("If a debtor

does something more or different in character from that which it was legally bound to do, it will

constitute consideration for the promise.")

The TPP Agreement makes clear that Plaintiffs' payments are held in accounts

maintained by servicers, instead of immediately applied to their loans, making them different in

character from the payments Plaintiffs were otherwise obligated to make.  FAC, Ex. 9 at 2.

Importantly, Wells Fargo requested that Plaintiffs make TPP payments instead of paying on their

pre-existing loan obligations.  Thus, making the TPP payments is a legal detriment to Plaintiffs.[16]

An independent basis for finding consideration is that Wells Fargo also received a benefit

from Plaintiffs' performance.  Wells Fargo performed an NPV test for each Plaintiff before

offering a TPP Agreement.  Mot. at 4.  In order for a borrower to qualify for a HAMP

modification, the NPV test must show that it is likely to be  more profitable for the servicer to

modify the loan than to allow the loan to go into foreclosure. Mot. at 4; FAC, Ex. 2 at 4-5.   If

Wells Fargo did not expect to be benefitted by the TPP Agreements, it would not have extended

them to Plaintiffs and requested Plaintiffs' compliance.

Other specific elements of Plaintiffs' performance also benefit Wells Fargo.  For

instance, where borrowers are required to set up escrow accounts, Wells Fargo is benefitted

because borrowers' risk of defaulting on property tax obligations is lessened, increasing the

value of Wells Fargo's security interest.  Credit counseling for borrowers is similarly beneficial

to Wells Fargo, since it presumably reduces the risk of default.  Borrowers' provision of detailed

financial information to Wells Fargo is also beneficial, since it should allow Wells Fargo to

predict with greater certainty borrowers' ability to pay and likelihood of default.  For borrowers

who do not satisfy the terms of the TPP Agreement and therefore do not receive a Home

---

[16] In attempting to avoid the conclusion that making TPP Payments is a legal detriment to Plaintiffs, Defendant tries to characterize these circumstances as *beneficial* to Plaintiffs.  Mot. at 13.  Defendant completely ignores both the definition of "legal detriment" and the fact that Plaintiffs must pay every penny of their loan obligations and potentially more, not to mention the increased risk of foreclosure and damage to Plaintiffs' credit scores that result from the deepening arrearages.  Only if Defendant follows through on its promises and provides Plaintiffs with permanent loan modifications, will the lower payments made during the TPP period constitute a benefit to Plaintiffs.  "A promise or an act may be a detriment although *on balance* the promisor is making a good bargain. Thus a promise to pay £10,000 for a Rolls Royce worth £12,000, is nonetheless a detriment."  Black's Law Dictionary (8th ed. 2004), detriment (quoting P.S. Atiyah, *An Introduction to the Law of Contract* 101 (3d ed. 1981)).

Affordable Modification, this information improves Wells Fargo's ability to make intelligent decisions about other loss mitigation options.  A bargained-for benefit to the promisor, even with no legal detriment to the promisee will render a bargain enforceable.  Williston, *supra*, §7:5; *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280 (1974) (money paid to promisor was sufficient consideration, even though it came from trust fund rather than from promisee, and was thus not detrimental to promisee).

Defendant cites the rule that a debtor's partial payment on a debt is not consideration for the creditor's promise to discharge the remainder of the debt.  Mot. at 15.  While this is an accurate statement of a recognized exception to the general rule that any detriment or benefit constitutes consideration, the pre-existing duty exception is narrow and is not applicable to the circumstances alleged in this case:

> The foundation of the rule [that payment of a less sum is not consideration for relinquishing a legal right to the remainder] seems therefore to be, that in the case of the acceptance of a less sum of money in discharge of a debt, inasmuch as there is no new consideration, no benefit accruing to the creditor, and no damage to the debtor, the creditor may violate, with legal impunity, his promise to his debtor, however freely and understandingly made. This rule, which obviously may be urged in violation of good faith, is not to be extended beyond its precise import; and whenever the technical reason for its application does not exist, the rule itself is not to be applied.

*Brooks v. White*, 43 Mass. 283, 285 (1841).  The very case cited by Defendant to establish the rule acknowledges its narrow applicability.  *In re Lloyd, Carr and Co.*, 617 F.2d 882, 890 (1st Cir. 1980) ("[E]xceptions are recognized to the general rule in cases where the circumstances indicate that the policy of deterring extortion is not applicable.").  *See also Emerson v. Deming*, 304 Mass. 478, 481 (1939) ("The application of the rule does not extend beyond the limits upon which it is based, and if the agreement for accord and satisfaction is shown to rest upon a new

consideration, in the way of some benefit to the creditor or detriment to the debtor, then such an agreement is valid.").

There can be no concern of extortion by the Plaintiffs in this case, who applied to participate in a large-scale loan modification program created by the U.S. Treasury in the face of a national economic crisis, and who attested to their real financial hardships.  FAC at ¶¶  45-46, 61, 63, 81-83.  Nor does Wells Fargo assert to the contrary.  Furthermore, the TPP Agreements at issue are neither factually nor legally equivalent to the narrow circumstances in which the pre-existing duty exception applies.  The TPP Agreement simply is not a promise to discharge a portion of the borrower's debt in exchange for partial payment.  Neither the TPP Agreement nor the Home Affordable Modification which should follow its successful completion involves any discharge of a borrower's original indebtedness.  The TPP Agreement itself provides that the borrower understands "that nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents." FAC, Ex. 9 at 3.  Nor are the borrower's obligations under the TPP Agreement limited to paying part (or even all) of the pre-existing debt.  Wells Fargo's attempt to avoid its contractual obligations by mischaracterizing the agreement as gratuitous debt forgiveness must fail.

### 2. *Plaintiffs Sufficiently Allege Damages*

Wells Fargo's argument that Plaintiffs have failed to state a claim for breach of contract because they fail to allege damages is likewise without foundation.  In order to state a claim for breach of contract, "in general, it is sufficient to aver the making of the contract, its terms and the breach thereof."  *Daddario v. City of Pittsfield*, 301 Mass. 552, 555 (1938).  *See also Hacker v. Nitschke*, 310 Mass. 754, 757 (1942) (finding sufficient a count which "alleges the facts upon which an implied contract arose, and the facts constituting a breach of that contract"); *Faulkner*, 2010 WL 2472275 at *8-9 (finding plaintiffs' allegations regarding the existence and breach of a

16

loan modification contract sufficient to defeat a motion to dismiss).

As discussed above, Plaintiffs have alleged that Wells Fargo entered into written contracts with each of them and with each member of the proposed class. FAC at ¶¶ 52, 68, 84, 96.  *See* Section II, *supra.*  It is a long established principle of Massachusetts law that "[f]or every breach of a promise made on good consideration, the law awards some damage." *Hagan v. Riley*, 13 Gray 515, 516 (Mass. 1859).  *See also Clark v. Gulesian*, 197 Mass. 492, 494 (1908); *Singarella v. City of Boston*, 342 Mass. 385, 386-387 (1961).  The object in determining the damages for a breach is to put the wronged party in as good a position as if the other party fully had performed.  *See e.g. Bucholz v. Green Bros. Co.*, 272 Mass. 49, 54 (1930).  Put another way, the plaintiff is entitled to damages for harms that "flow according to common understanding as the natural and probable consequences of the breach." *Evans v. Yegen Associates, Inc.*, 556 F. Supp. 1219, 1230 (D. Mass. 1982) (citing *Bucholz*, 272 Mass. at 54).  There is no requirement of specific pleading for damages flowing naturally from the breach.  *See Sherlag* at 235.  Defendant does not and cannot cite authority to the contrary.

Had Wells Fargo timely performed under the TPP Agreements it entered into with Plaintiffs instead of keeping them in an indeterminate limbo, Plaintiffs' would have received a Home Affordable Modification before the end of the TPP period, altering their loan documents effective the first day of the month following the three-month TPP period. FAC, Ex. 9 at 1, 2. Upon modification of their loan documents, Plaintiffs no longer would have been in default of their mortgage obligations (which they necessarily were during the TPP, even if they were current at the start of the TPP), all existing arrearages would have been capitalized, late fees would have been forgiven and Plaintiffs would have had affordable monthly payment amounts going forward. FAC, Ex. 9 at 3, Ex. 2 at 9, 15, 18, 22.  Each month that Wells Fargo fails to

perform its obligations under the TPP Agreements, Plaintiffs' existing loan documents remain in full force and effect and Plaintiffs accrue greater fees and charges, are forced further into delinquency on their mortgages, are in default for longer periods, are at heightened risk of losing their homes to foreclosure, and experience further damage to their credit.  FAC ¶¶ 123-124. These consequences are the natural result of Wells Fargo's breaches.  Plaintiffs' allegations – which set out the existence and terms of the contracts and the alleged breach – are sufficient to put Wells Fargo on notice of the damages that are the consequence of such breach, and therefore are sufficient.

Even if those allegations were not enough, Plaintiffs also have alleged damages more specifically.  Had Wells Fargo timely performed under the TPP Agreements it entered into with Plaintiffs, Plaintiffs would not have been subjected to any foreclosure-related activity during the period after their permanent modifications would have become effective (because Plaintiffs would no longer have been in default).  In addition, Wells Fargo's extension of the three-month trial period into an ongoing period of review at its discretion causes harm.  Any modification extended by Wells Fargo in a month beyond the close of the trial period will necessarily mean that the permanent modification offered will be on less favorable terms to the borrower. FAC at ¶¶ 55-56, 93, 116, 123-24, 131, 135.  This is because as each month passes, interest under the original note accrues and servicers add fees and costs, including those related to foreclosure, that will be capitalized in the modified principal balance.  *Id.*  Had Wells Fargo not breached the TPP Agreement and offered the permanent modification at the close of the trial period, these costs would not have accrued.  Last, foreclosure activity constitutes independent injury.  As described above, Plaintiffs have experienced foreclosure activity ranging from improper threats to

foreclosure sales.  *See supra* at 5 & n.8.[17]

### 3.      *The TPP Agreements Are Complete, Enforceable Contracts*

The TPP Agreements establish the precise nature and timing of each party's obligations

and leave nothing to be negotiated at a later date.  They are complete and enforceable contracts.

Defendant asserts that key terms of the permanent modification that is to follow the trial period

are left undetermined.  Mot. at 16.  As explained below, this is wrong (and Defendant identifies

no other missing terms that could destroy the enforceability of the contract).  The loan

modification cases cited by Wells Fargo are inapplicable, because the TPP Agreement is not

itself a loan agreement, but a promise to *provide* Plaintiffs with such an agreement at a specified

date if Plaintiffs comply with the necessary conditions.  Nor is the TPP Agreement a mere

"agreement to agree," since the essential terms of the promised Home Affordable Modification

Agreement are not open to negotiation or discretionary alteration by either side.

The TPP Agreement makes clear that the terms of the permanent modification are to be

determined using the mathematical formulas provided for in the HAMP Program

Documentation.  The very first sentence of the TPP Agreement provides:

> If I am in compliance with this Trial Period Plan…, then the Lender will provide
> me with a Home Affordable Modification Agreement ("Modification
> Agreement"), as set forth in Section 3.

FAC, Ex. 9 at 1.  "Home Affordable Modification Agreement" is not generic language; the term

has technical meaning, supplied by the HAMP Program Documentation.[18]  As this court has

---

[17] Plaintiffs also allege that they were damaged by losing opportunities to pursue other means of avoiding foreclosure.  FAC at ¶¶ 116, 124, 131.  These lost opportunities are not too speculative.  *Cf. Don v. Soo Hoo*, 75 Mass. App. Ct. 80 (2009) (affirming jury award of damages for lost opportunity to obtain a bankruptcy discharge).

[18] Other language of the TPP Agreements supports the conclusion that the terms of the permanent modification are to be determined by reference to HAMP.  The TPP Agreement is titled the "HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN" in large, capitalized, bold font at the top of the contract. FAC, Ex. 9 at 1.  There is a footnote on each page of the Plan that identifies the contract as a

noted in the context of a consent decree interpreted as a contract, Massachusetts courts rely upon "the usual considerations of contract interpretation, including the language of the decree; the circumstances surrounding its formation; its purposes; any technical meaning words used may have had to the parties; and any other documents expressly incorporated in the decree." *U.S. v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 432 (D. Mass. 2001).

As discussed above, *see supra* Section IV(A)(1), the Court may look to HAMP and its Supplemental Directives as extrinsic sources providing meaning to the contractual terms agreed to by the parties. *See United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 172 (D. Mass. 2004). In this instance, the precise terms of the promised permanent modification are ascertainable by operation of these rules. Wells Fargo acknowledges as much in its brief, where it discusses the process by which permanent modification terms are to be calculated. *See* Mot. at 3-4. The interest rate, the term of the loan, and the principal balance of a modified loan under HAMP are subject to the "waterfall" formula that is designed to reduce the monthly payment to 31% of the borrower's monthly gross income. *Id.*, FAC, Ex. 2 at 8-10. After Wells Fargo verifies that its initial finding of eligibility was correct, it works backward from the borrower's income, pursuant to this formula, in order to set each of the relevant variables. FAC, Ex. 2 at 8-10. The formula, however, remains the same for all borrowers. In other words, each TPP Agreement contemplates a HAMP permanent modification, the precise terms of which are ascertainable and are not subject to negotiation between the parties.

Decades of Massachusetts court decisions confirm the conclusion that the TPP Agreements are complete, addressing all of the parties' duties and obligations, and therefore are enforceable contracts. "The courts… are slow to turn a plaintiff out of court for the reason that

---

"Fannie Mae/Freddie Mac Uniform Instrument" created for HAMP participating servicers. FAC, Ex. 9 at 1-3.

the promise given and relied on was so vague that it can be given no effect." *Weiner v. Pictorial Paper Package Corp.*, 303 Mass. 123 (1939).  "[T]he need for further documents does not preclude the formation of a binding agreement." *Targus Group Intern., Inc. v. Sherman*, 76 Mass. App. Ct. 421, 429 (2010).  *See also George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*, 283 Mass. 383, 388 (1933) (finding that for a contract to be enforceable, the terms need only be set out "with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.").  The TPP Agreements contain every term necessary for compliance by each party and for enforcement by the courts in the event of a breach.

> ### C. Plaintiffs Have Stated a Claim for Breach of the Covenant of Good Faith and Fair Dealing

As discussed above, Plaintiffs adequately have alleged the existence of contracts between themselves and Wells Fargo.  "Every contract implies good faith and fair dealing between the parties to it.  The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 569-570 (2010) (internal quotations and citations omitted).  The "essential inquiry" when determining whether a party to a contract has breached the covenant of good faith and fair dealing is to consider whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain." *Speakman v. Allmerica Financial Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  The covenant is violated where there is "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Restatement (Second) Contracts* §205.

The fruits of the TPP Agreement that should have flowed to Plaintiffs consisted of the promised protection from foreclosure during the plan and a permanent loan modification at the end of three months, with all arrearages capitalized, late fees forgiven and affordable payments. FAC, Ex. 9.  In order to secure those fruits, Plaintiffs had to comply with the TPP Agreement. *Id.*

Wells Fargo, by its actions, has interfered with Plaintiffs' ability to secure the benefits of the contracts in at least two ways.  First, Plaintiffs allege that Wells Fargo fails to communicate with or adequately supervise foreclosure attorneys (FAC at ¶121), so that Plaintiffs are not protected from foreclosure activity during the TPP, in either the initial three months, or when it extends for longer.  Although the TPP specifies that "the Lender will suspend any scheduled foreclosure sale," FAC, Ex. 9 at 2, Wells Fargo has allowed sales of some Plaintiffs' homes, and has threatened others while the trial period is pending. *See supra* at 5 & n.8.  Wells Fargo's behavior very clearly breaches the covenant of good faith and fair dealing.  *See, e.g., Tufankjian v. Rockland Trust Co.* 57 Mass. App. Ct. 173, 178-179 (2003) (finding that bank which agreed to provide financing for auto-dealership violated the covenant by "conducting itself in a manner at odds" with borrower by, *inter alia*, failing to complete appraisal on time and using a more expensive appraiser).

Second, Plaintiffs allege that Wells Fargo undermines Plaintiffs' ability to satisfy the requirement to provide income verification by failing to hire sufficient staff, by losing documents, repeatedly requesting documents it had already received, giving conflicting and confusing instructions to borrowers, not responding to borrowers' inquiries, and making mistakes in processing documents.  FAC at ¶¶ 55-56, 91-92, 121, 123.  By promising borrowers one thing without the intention and/or ability to provide it, Wells Fargo dishonestly breached the

covenant.  *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009) ("In the lender-

borrower context, the implied covenant would require that the bank be honest in its dealings with

plaintiffs") (internal quotations omitted).[19]

Even if such actions do not breach the letter of the TPP Agreement, they are a breach of

the covenant of good faith and fair dealing. *Massachusetts v. Mylan Laboratories*, 608 F. Supp.

2d 127, 158-59 (D. Mass. 2008), *citing Speakman*, 367 F. Supp. 2d at 132 (breach of covenant

does not require breach of contract).[20]

### D.   Plaintiffs Have Made Allegations Sufficient to Entitle Them to Relief Based Upon Promissory Estoppel

There are three essential elements that, if met, give rise to a claim for promissory

estoppel.  There must be 1) a representation or conduct amounting to a representation intended to

induce a course of conduct on the part of the person to whom the representation is made; 2) an

act or omission resulting from the representation by the person to whom it was made; and 3)

detriment to such person as a result of the act or omission.  *See e.g. Turnpike Motors, Inc. v.

Newbury Group, Inc.*, 413 Mass. 119, 123 (1992).

Defendant's argument for dismissing Plaintiffs' promissory estoppel claim is a repetition

of its contract arguments, and just as ineffectual.  Defendant asserts that Plaintiffs have not

alleged damage or detriment as a result of their reliance on and performance under the TPP

[19] Wells Fargo citation of *FAMM Steel* stretches the case beyond the breaking point.  *See* Mot. at 21. Although the borrower in *FAMM Steel* was already in default, the Court's holding centered on the finding that it did not exhibit entitlement to the fruits of labor already earned.  *See FAMM Steel*, 517 F.3d at 100-101, *citing F.D.I.C. v. LeBlanc,* 85 F.3d 815, 821-822 (1st Cir. 1996).  In the case *sub judice*, although named plaintiffs are in default of a note between themselves and a party not before the Court, they are claiming breach of the covenant of good faith and fair dealing on the basis of a different contract – the TPP Agreement -- under which they have fully performed.  Thus, Plaintiffs have been deprived the fruits of labor under this contract, which they secured by making timely payments and otherwise complying with the TPP Agreement.
[20] A claim for breach of the covenant of good faith and fair dealing does not require a showing of bad faith.  *Liss v. Studeny*, 450 Mass. 473, 477 & n.3 (2008) (citing *Nile v. Nile*, 432 Mass. 390, 398-399 (2000)).

Agreement. Mot. at 20. As discussed in Section IV(B)(1), above, Plaintiffs payments and other

performance under the TPP Agreement constitute detrimental reliance on Defendant's promises.

Detriment in the context of contract or promissory estoppel means "giving up something which

immediately prior thereto the promisee was privileged to retain, or doing something or refraining

from doing something which he was then privileged not to do, or to refrain from doing."

*Cavanaugh v. U.S. Government*, 640 F. Supp. 437, 440 (D. Mass. 1986) (citing Williston,

Contracts [3rd ed.] § 102A). Also, Plaintiffs were damaged by their reliance, as discussed in

Section IV(B)(2), *supra*.

     **E.**      **Plaintiffs State a Claim for Relief Under G.L. c. 93A**

          *1.*      *Analyzed Under the Correct Standard, the Complaint Adequately Alleges Unfair and Deceptive Acts or Practices*

Wells Fargo's assertion that the Plaintiffs have failed to adequately plead a cause of

action under G.L. c. 93A is likewise wrong. The error of Wells Fargo's position begins with its

misstatement of the standard under which courts are to identify unfair or deceptive acts. *See*

Mot. at 25 (stating that unfair or deceptive conduct "must attain a level of rascality that would

raise an eyebrow of someone inured to the rough and tumble world of commerce.") The "level

of rascality" standard was expressly rejected by the Supreme Judicial Court fifteen years ago.

"We view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness' in

deciding questions of unfairness under G.L. c. 93A." *Massachusetts Employers Ins. Exchange v.*

*Propac-Mass, Inc.*, 420 Mass. 39, 42-43 (1995) ("*MEIC*"). Instead, the SJC has instructed court

to "focus on the nature of the challenged conduct and on the purpose and effect of that conduct

as the crucial factors in making a G.L. c. 93A fairness determination." *Id.; See also States*

*Resources Corp. v. The Architectural Team, Inc.*, 433 F.3d 73, 84-85 (1st Cir. 2005); *Incase Inc.*

*v. Timex Corp.*, 488 F.3d 46, 57 (1st Cir. 2007) ("*Incase*"). Properly articulated, the test for

unfairness also focuses on the equities between the parties, including an examination of the knowledge and bargaining power of the plaintiff. *Incase*, 488 F.3d at 57; *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349 (1983) ("In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties. . . . What a defendant knew or should have known may be relevant in determining unfairness. . . . Similarly, a plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair.")

Evaluated under the proper standards, Plaintiffs have successfully pled that Wells Fargo's actions were unfair and deceptive and constitute a violation of G.L. c.93A. Specifically, Paragraph 134 of the Complaint itemizes the ways in which Wells Fargo's conduct violated recognized standards of unfairness. Chief among these allegations is Wells Fargo's contravention of 940 C.M.R. § 3.16, which prohibits conduct that runs afoul of existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare, as well as conduct that is contrary to public policy and generally recognized standards applicable to the consumer lending business. The TPP Agreement and HAMP, as described in the Complaint, certainly fall within these categories because HAMP is a government program specifically intended to stem the tide of foreclosures. FAC at ¶¶ 20-32. As argued above, *see supra* Section IV(A)(1), the Court is permitted to look to the TPP Agreement, as well as the context of the federal program from which it emerged, to determine whether Wells Fargo's actions violate G.L. c. 93A.

Viewed in the light most favorable to Plaintiffs, and accepting the allegations of the Complaint as true, there can be no doubt that Wells Fargo's actions violate Chapter 93A. The equities between the parties heavily weigh in favor of Plaintiffs, who are individual homeowners

faced with the very real prospect of losing their homes, as demonstrated by the case of the Voltaires.  The effect of Wells Fargo's conduct in failing to keep its promises is to place Plaintiffs who have complied with the TPP Agreement in a terrifying limbo.[21]  Moreover, Wells Fargo's conduct is alleged to be deceptive because it reasonably can be found to have caused the plaintiffs to act differently than they otherwise would have acted. *Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982).  Here, Wells Fargo's conduct mislead Plaintiffs into believing that their compliance with the TPP Agreement would result in a permanent loan modification within three months.  As alleged in the Complaint, these representations caused Plaintiffs to change course.  FAC ¶ 135(f).

Last, Wells Fargo's claim that Plaintiffs have failed to plead injury or causation is without merit.  Paragraphs 116, 124, 131 and 135 of the Complaint each detail specific injuries suffered by Plaintiffs, including: wrongful foreclosures (as in the case of the Voltaires); less favorable loan modifications because a permanent modification under HAMP after the end of the trial period  includes the capitalization of interest, fees and costs that would not have been present in a timely modification); increased fees and other costs to avoid or attempt to avoid foreclosure; loss of savings in fruitless attempts to secure loan modifications; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress.  That Wells Fargo questions the existence of these damages does not change the fact that they have been well-pled.

## 2.    *Plaintiffs Met the Demand Letter Requirement of G.L. c. 93A*

Wells Fargo argues that the demand letter sent by the Bosques on February 24, 2010 was

---

[21] Wells Fargo repeatedly cites figures it claims establish it as having completed just as many if not more loan modifications than other servicers in the industry. *See* Mot. at 3 n.1, 22.  Putting aside the inappropriateness of deciding factual issues at this stage of the litigation, a Defendant's showing that its practice is consistent with industry standards will not insulate it from liability under Chapter 93A. *Commonwealth v. DeCotis,* 366 Mass. 234, 240 (1974).

inadequate under G.L. c. 93A to request relief on behalf of a class.  Yet, the very first sentence of

the letter, attached as Exhibit 11 to the Complaint ("the Demand Letter"), states that it is being

sent by the Bosques, another previous named plaintiff "and a class of similarly situated

individuals."  The eight-page Demand Letter goes on to explicitly describe the putative class on

whose behalf it was sent:

> Claimants believe that there are hundreds, if not thousands, of Massachusetts
> residents who are similarly situated to [named plaintiffs], i.e. homeowners who
> have entered into Trial Period Plan ("TPP") Agreements with Wells Fargo under
> the U.S. Treasury Department's Home Affordable Modification Program
> ("HAMP"), complied with all of the requirements of such Agreements, including
> but not limited to the making of three monthly Trial Period payments and the
> provision of documentation, yet have not been given a permanent modification in
> accord with the TPP Agreement.  The identities of such Massachusetts residents
> are known only to ASC.

Demand Letter at 2.  Wells Fargo cannot claim, therefore, that the Demand Letter was

insufficiently descriptive of the claimants sending the letter.  In these circumstances, the putative

class is entitled to rely upon the initial demand letter in satisfaction of the statutory requirement.

The Court's analysis of this issue should begin with the Supreme Judicial Court's

admonishment regarding chapter 93A that "technicalities are not to be read into the statute in

such a way as to impede the accomplishment of substantial justice."  *Baldassari v. Public Fin.*

*Trust*, 369 Mass. 33, 41 (1975) ("*Baldassari*").   "This includes the reading of the demand letter

requirement." *Richards v. Arteva Specialties S.A.R.I.*, 66 Mass. App. Ct. 726, 730 (2006)

("*Richards*"), *citing Baldassari*, 369 Mass. at 41-42.  Wells Fargo's complaint regarding the

Demand Letter is archetypal of a "technicality" put forth to defeat Plaintiffs' legitimate claims.

The burden should thus be placed on Wells Fargo to show how the Plaintiffs' course of action

undermines the interests promoted by the statute's demand letter requirement.

Wells Fargo cannot meet this burden. Wells Fargo identifies the purpose of the demand

letter requirement as "encourag[ing] negotiation and settlement" and "operat[ing] as a control on the amount of damages . . . ." Mot. at 29. Wells Fargo claims that it could not make a settlement offer to Plaintiffs or putative class members because they were not individually identified in the demand letter. This position strains credibility. Counsel routinely engage in classwide settlement discussions prior to the certification of a class, and classes are frequently certified at the same time as the court considers a proposed class settlement.[22] Furthermore, the information required to determine the number and identities of the individuals on whose behalf the letter was sent is in Wells Fargo's possession, and not available to Plaintiffs prior to discovery. Wells Fargo should be able to determine with precision from examination of its own records which of its borrowers in Massachusetts have been offered TPP Agreements, have submitted documentation verifying their income, made their payments for three months, and have not received a Modification Agreement.

It is important to note that Wells Fargo has *not* asserted that the Demand Letter insufficiently described the unfair practice alleged or the damages claimed. Wells Fargo's sole criticism of the Demand Letter -- its unavoidable failure to individually identify all other class members – has been explicitly rejected by the Massachusetts Appeals Court in *Richards*, *supra*. The court there engaged in a close textual analysis to conclude that the statute's use of the singular forms "claimant" and "petitioner" was significant and intentional, *Richards* holds that a demand letter sent on behalf of a class need only identify the class representative himself, and adequately describe only her injury. *See Richards*, 66 Mass. App. Ct. at 732  (noting that the legislature chose *not* to require the demand letter to identify "the claimant and any similarly

---

[22] Indeed, the law firms involved on both sides of this case have negotiated and entered into classwide settlements in other cases prior to class certification. *See Allen, et. al v. Decision One Mortgage Co.*, Civ. Action No. 07-11669-GAO (D. Mass. May 13, 2010) (entry of Final Approval Order in class case) (attached as Exhibit 1 hereto).

situated persons on behalf of whom the claimant brings the action.")   Such a position makes eminent sense – the whole purpose of Rule 23 is to aggregate a multitude of claimants not before the court through the use of adequate class representatives who share common claims, are typical, and otherwise meet the requirements of the rule.   So long as the Demand Letter served to put Wells Fargo on notice as to the identity of that class, in order that it might assess an appropriate offer of settlement, the Plaintiffs have met their duties under the statute.

Wells Fargo's position that an individual class representative should not be permitted to submit a demand on behalf of similarly situated individuals, if accepted, would eviscerate Chapter 93A's class action component.   Chapter 93A is not merely subject to Rule 23 – the Massachusetts legislature saw fit to provide expressly for class actions in G.L. c. 93A §9(2).   The Supreme Judicial Court subsequently has recognized the value of the class action device, even when it must be reconciled with the demand letter requirement.   "If a proper demand is made by one plaintiff, identifying him as the claimant and reasonably describing the act or practice relied on and the injury suffered by him, we think he and others similarly situated may join in a class action to redress that injury and similar injuries caused by the same act or practice.   Multiple demands for relief need not be filed on behalf of all the members of the class." *Baldassari*, 369 Mass. at 42.[23]

---

[23] *Baldassari* left open the question whether this same reasoning applied in a situation where the class representative accepts the original offer of settlement as an individual.   Nevertheless, where the Demand Letter's description of the injury and damages to the class is not challenged as inadequate, Plaintiffs assert that the same rationale identified by the *Baldassari* Court applies.   Plaintiffs seek, *inter alia,* classwide injunctive relief – yet to require a succession of class representatives to present Demand Letters each time their predecessor is picked off by the Defendant would render chapter 93A's class action component null and void.   "The modern class action is 'designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.'" *Baldassari*, 369 Mass. at 42, *quoting American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974).   In a similar vein, the Supreme Court has stated:

> Requiring multiple plaintiffs to bring separate actions, which effectively could be "picked off" by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions;

## V.    CONCLUSION

For the reasons stated above, the Court should deny Wells Fargo's motion to dismiss the

Complaint.

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-8010 *(telephone)*
(617) 542-8028 *(fax)*

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE:  August 11, 2010

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on August 11, 2010.

*/s/ Gary Klein*
Gary Klein (BBO 560769)

---

moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement.
*Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980).