**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **WILFREDO and ODALID BOSQUE, VERA VICENTE MEEK, JENNIFER WILLIAMS, JENNIFER RYAN and GARY VOLTAIRE, and PAUL MONTERO, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) ) | **C.A. NO. 10-10311-FDS** |
| **Plaintiffs,** | ) ) | **Leave to file granted** |
| **vs.** | ) ) | **December 7, 2010** |
| **WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY**, | ) ) ) ) ) | |
| **Defendant.** | ) ) | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION TO PREVENT DEFENDANT FROM FORECLOSING ON THEIR MORTGAGES**

## I.      INTRODUCTION

Wells Fargo admits that it has made mistakes in its implementation of the Home Affordable Loan Modification Program ("HAMP"). "Inevitably, some mistakes may have occurred due to the sheer size of the program." Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 19, ("Opposition"), *citing*, the Declaration of Ben Windust ("Windust Decl." ¶40). Nobody understands this better than Paul Montero and Jennifer Ryan Voltaire, two of the Plaintiffs in this case, who nearly lost their homes due to what Wells Fargo now characterizes as its "mistakes."[1] See, Section II, *infra*. Properly tailored

---

[1] It is highly unlikely that the only two families who were victims of these mistakes happened to come forward to the same law firm for representation.

preliminary injunctive relief is necessary because other Massachusetts families should not suffer in the same way as Mr. Montero and Ms. Voltaire.

Wells Fargo essentially concedes that many families could and would lose their homes before the Court can address this case on the merits.   Nevertheless, Wells Fargo argues that the Court has no power to preserve the *status quo pendente lite* by temporarily staying these foreclosures. Wells Fargo's arguments are wrong on both the law and the equities. Temporary voluntary cessation of the Plaintiffs' foreclosures does not moot a request for injunctive relief. Wells Fargo incorrectly assumes that the Court cannot consider the effect of the dispute on similarly situated borrowers, either under its equity powers (See, Section E, *infra*) or when class certification is proper under Fed. R. Civ. P. 23.[2]

Plaintiffs present a compelling case for preliminary injunctive relief and satisfy the standard for granting it. Indeed, the bulk of Wells Fargo's argument - that Plaintiffs are unlikely to succeed on the merits of their claims - is belied by Judge Stearns' recent decision denying another national mortgage servicer's motion to dismiss breach of contract and related claims that are based on the same facts and legal theory as Plaintiffs' complaint here. *Durmic v. JP Morgan Chase Bank, NA,* No. 1:10-cv-10380-RGS, 2010 WL 4825632 (D. Mass. Nov. 24, 2010).

---

[2] Plaintiffs incorporate their [Proposed] Reply in Support of Plaintiffs' Motion for "Provisional" Class Certification, filed separately, herein. Plaintiffs also point to a highly relevant decision in which another federal District Court simultaneously certified a class and issued injunctive relief to stop foreclosures while the litigants were adjudicating their rights under a federal government program. In *Coleman v. Block*, 562 F. Supp. 1353,1356-1363 (D.C.N.D. 1983), the Court issued injunctive relief to stop Farmers Home Administration ("FmHA") officials from taking foreclosure action on North Dakota farmers while they were challenging the FmHA's refusals of their loan deferment applications. The injunction was later expanded to a national class.  *Coleman v. Block*, 580 F.Supp. 192 (D.C.N.D. 1983).

If the Court is not inclined to issue an order enjoining Wells Fargo from foreclosing on putative class members' homes as requested in Plaintiffs' preliminary injunction and accompanying class certification motions, [Docket Nos. 29, 31], the record compels some form of injunctive relief so Wells Fargo's conduct, whether intentional or by mistake, does not cause other borrowers like Ms. Voltaire to unnecessarily lose their homes while their legal rights are being determined.

Plaintiffs have simultaneously filed a Motion for Notice Relief Pursuant to Fed. R. Civ. P. 23(d)(1) or, in the Alternative, for Expedited Discovery ("Notice Relief Motion") which explains that in lieu of requiring Wells Fargo to stop foreclosures, the Court can order Wells Fargo to provide notice to borrowers in the putative class before beginning foreclosures so these families have an opportunity to avoid foreclosure. In addition, the Court has discretion to allow Plaintiffs to obtain expedited discovery before holding a hearing on their preliminary injunction motion so that they may obtain evidence relating to Wells Fargo's HAMP policies and practices that will assist them and the Court to evaluate the appropriate scope and nature of injunctive relief.

## II.   FACTS

While Wells Fargo claims to have a policy (a copy of which it has not submitted) of not foreclosing on mortgages when a borrower has applied for a HAMP modification and Wells Fargo has not yet made an eligibility determination, (Opposition, p. 2), the record in this case contains clear evidence that any such policy is not being implemented or enforced. Paul Montero ("Mr. Montero") has never received a denial notice from Wells Fargo. Affidavit of Paul Montero, ¶17 ("Montero Aff.."), [Docket No. 33]. In June 2010, a Wells Fargo representative told him that his application was still under review.

Montero Aff., ¶15. The next month, on July 2, 2010, Mr. Montero received a Notice of

Foreclosure Sale with a sale date set on August 4, 2010. Montero Aff., ¶21. Mr. Montero

spent the next month trying to communicate with Wells Fargo, objecting to its going

forward with a foreclosure sale when he had complied with the TPP Agreement. Montero

Aff., ¶¶22-29. During the week before the scheduled foreclosure sale, Mr. Montero

telephoned Wells Fargo and Harmon Law six times in a four-day period and was told

something different each time he asked whether his foreclosure sale was postponed.

Montero Aff., ¶24-31. It was not until Mr. Montero retained Plaintiffs' counsel, who

contacted Harmon Law Offices on his behalf on August 3, 2010, that he received a

formal written commitment that Wells Fargo cancelled the foreclosure sale. See, Montero

Aff., ¶38; See, Declaration of Irene C. Friedel, ¶2 ("Friedel Decl.,") ¶2 [Docket No. 42]

(explaining that Wells Fargo placed a foreclosure hold on Plaintiffs' loans only when they

joined the lawsuit).[3] Wells Fargo only confirmed that no foreclosure proceedings would

be commenced against Mr. Montero and the other Plaintiffs while this case is pending

only after Plaintiffs filed their preliminary injunction motion. *Id.*

Jennifer Ryan Voltaire ("Ms. Voltaire") details her story about how Wells Fargo

foreclosed on her home at the same time its representatives were telling her that her

HAMP application was still under review and when she had continued to make payments

---

[3] Mr. Montero's experience illustrates the problem with Wells Fargo's contention that placing formal foreclosure holds only the mortgages of the Plaintiffs to this lawsuit is sufficient injunctive relief. His foreclosure sale was set on August 4, 2010 and he was lucky enough to be able to retain Plaintiffs' counsel to halt it. At that time, he was not a named Plaintiff in the lawsuit. [Docket No. 26] (Second Amended Complaint adding Mr. Montero as a named Plaintiff on August 17). Borrowers like Mr. Montero, who are unaware that this action is pending, will lose important legal rights that could save their homes without injunctive relief.

and submit all the necessary documentation under her TPP Agreement. Declaration of

Jennifer Ryan Voltaire, ("Voltaire Decl."), ¶¶19-26 [Docket No. 21]. Ms. Voltaire attests

that, "[o]n July 19, 2010, with the assistance of [the National Credit Alliance], I contacted

Wells Fargo by telephone and spoke with a representative named Chantelle. Chantelle

confirmed that Wells Fargo had received my submissions from the prior week, and that

*Wells Fargo's consideration for the modification was ongoing, but also said that the*

*foreclosure postponement had not yet been processed.*" Voltaire Decl., ¶24. (emphasis

added). Amidst the lack of clarity as to Ms. Voltaire's HAMP status, Wells Fargo sold her

home. Voltaire Decl., 14-26. Like Mr. Montero, Ms. Voltaire was only able to obtain

some relief by retaining Plaintiffs' counsel, who filed a motion for a temporary

restraining order to prevent Wells Fargo from selling her home to a third-party and from

evicting her. [Docket Nos. 19, 22].

## III.   ARGUMENT

## A.   WELLS FARGO'S VOLUNTARY CESSATION OF PLAINTIFFS' FORECLOSURES DOES NOT RENDER THIS CONTROVERSY MOOT

Wells Fargo argues that none of the Plaintiffs has "standing" to pursue

preliminary injunctive relief because they put a hold on Mr. Montero's foreclosure.[4]

---

[4] While Plaintiffs commend Wells Fargo's willingness to provide relief to the Plaintiffs who have joined the lawsuit, its hold on their foreclosures proceeding constitutes an inappropriate "pick-off" attempt, the underlying purpose of which is to undermine the ability of Plaintiffs' request for injunctive relief for similarly-situated homeowners to go forward. "The notion that a defendant may short-circuit a class action by paying off the class representatives...deserves short shrift. Indeed, were it so easy to end class actions, few would survive." *Roper v. Consurve, Inc.,* 578 F.2d 1106, 1110 (5th Cir. 1978) *aff'd* 445 U.S. 326 (1980). To allow such behavior would "undercut the viability of the class action procedure...." *Weiss v. Regal Collections,* 385 F.3d 337, 344 (3d Cir. 2004).

Opposition, pp. 6-8. This position rings hollow for several reasons. First, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc.,* 528 U.S. at 189, *quoting City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982). "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.* Instead, such a case is moot only if the defendant meets the "heavy burden" of persuading the court that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* So, where the First Circuit reviewed an injunction against a defendant that had voluntarily ceased the offending activity prior to the motion to enjoin, it found that burden had not been met. *Metro-Goldwyn Mayer, Inc. v. 007 Safety Products, Inc.*, 183 F.3d 10, 15 (1st Cir. 1999) ("*MGM*") ("'The burden of demonstrating mootness is a 'heavy one,'' and it fell to [defendant] to demonstrate that its past attempts to [repeat the disputed conduct] likely would not recur.").

The First Circuit has emphasized that for cases where the likelihood of recurrence is uncertain, the trial court is free to take into account other considerations, including equitable factors, that "bear[] on whether a case that began with a concrete controversy should be dismissed when the conduct ceases." *Adams v. Bowater Inc.*, 313 F.3d 611, 614 (1st Cir. 2002) ("*Adams*"). [5] As with the defendant in *Adams*, Wells Fargo here is

_____

[5] According to *Adams*, these other considerations include whether the alleged harm is capable of repetition yet evading review. *Adams*, 313 F.3d at 614 n.1, *citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 186 n. 9 (1982). In Massachusetts, this exception to the mootness doctrine applies where a case presents an issue of importance to the public, where the parties are capable of making full argument to the court, and where the issue is likely to recur in similar factual circumstances, yet temporally limited such that it will usually be resolved during the pendency of the

unwilling to admit that it was wrong to institute foreclosure proceedings against Mr.

Montero and the Voltaires in the first place.  "[W]here a defendant is unwilling to give

any assurance that the conduct will not be repeated, a natural suspicion is provoked that

recurrence may well be a realistic possibility." *Adams,* 313 F.3d at 615. Once homes are

improperly foreclosed with the resulting displacement of families, the *status quo* at issue

can never be restored. Finally, Wells Fargo has not promised that it will stop pending and

future foreclosures of putative class members who are in situations like Mr. Montero and

Ms. Voltaire, or who have been or will be subject to Wells Fargo's contractually invalid

HAMP denials.[6]

## B.    THE PRELIMINARY INJUNCTION REQUIREMENTS ARE MET

### 1.    *Plaintiffs Are Likely to Succeed on the Merits*

On November 24, 2010, in a Memorandum Opinion and Order on another

national mortgage servicer's motion to dismiss a complaint substantially identical to

Plaintiffs', Judge Stearns found that the same form TPP Agreements Plaintiffs allege

Wells Fargo breached here are valid contracts under Massachusetts law. *Durmic,* at *2-5.

---

litigation. *Lockhart v. Attorney General*, 390 Mass. 780, 782-83 (1984).  This is just such
a case.  Wells Fargo's systemic broken promises to borrowers struggling with their
mortgage payments presents an issue of profound public importance, especially in the
midst of a national foreclosure crisis.

[6] The most recently publicized statistics on Wells Fargo's performance under HAMP
indicate that many more Wells Fargo borrowers are or will be subject to HAMP denials
and at risk of foreclosure. The U.S. Department of the Treasury's most recent report on
the implementation of the HAMP program reported that through October 2010, Wells
Fargo converted only 31% of eligible trials to permanent modifications at an average trial
length of 5.0 months.  "Making Home Affordable Program: Service Performance Report
Through October 2010," U.S. Department of the Treasury, at 4, *available at*
http://financialstability.gov/docs/Oct%202010%20MHA%20Public%20Final.pdf (last
visited December 6, 2010). As of October 31, 2010, Wells Fargo had an estimated
2,384 loans in active trials that were initiated at least six months ago ("aged").  *Id.*
Through September 2010, a total of 118,175 Wells Fargo borrowers had canceled HAMP
trial modifications.  Of these, 18,384 had foreclosure proceedings start.  *Id.* at 5.

In his opinion, Judge Stearns rejected the same arguments Wells Fargo makes here,

finding that the TPP Agreements are contracts supported by consideration. Focusing on

the express language of the TPP Agreements, Judge Stearns found that the TPP

Agreements are promises to provide Plaintiffs with a loan agreement at a specified date if

Plaintiffs comply with their requirements, and that the essential terms of the loan

agreements are easily determinable by HAMP's mathematical formulas. *Durmic*, at *1,2,

4. Judge Stearns identified several benefits to Wells Fargo and legal detriments to the

Plaintiffs that the TPP Agreements required, noting that both conditions for consideration

were met, even though only one is necessary.[7] *Id*. See also, *Wells Fargo Bank, N.A.,*

*successor by merger to Wells Fargo Home Mortgage, Inc. v Paul Meyers,* No. 34632-09,

NYLJ 1202475060382 (N.Y. Supreme Ct., Nov. 10, 2010) ("*Meyers*"). Like this case,

*Meyers* involves a homeowner seeking to enforce a TPP Agreement made under HAMP

by Wells Fargo. *Id*. In *Meyers*, New York's Supreme Court (which is the state's trial

court), ruled in the context of a judicial foreclosure action in which the homeowner has

raised the defense that he was offered a binding agreement to be tendered a Home

Affordable Modification if he complied with certain conditions, including the TPP

Agreement. *Id*. The *Meyers* Court, relying on its equitable powers, ruled that, "the

appropriate remedy is to compel specific performance of the [TPP Agreement] proposed

---

[7] Under the TPP Agreements, Plaintiffs made monthly payments, provided documentation of their current income, made legal representations about their personal circumstances and agreed to undergo credit counseling if Chase requested. In some cases, Plaintiffs could also be required to make payments into a newly established escrow account. Chase benefits from these requirements because escrow accounts reduce the risk of default on property taxes, credit counseling reduces the risk that borrowers will default, and being able to re-underwrite loans with the detailed financial information borrowers are required to provide allows Chase to evaluate accurately borrowers ability to pay. *Durmic*, at *3.

by [Wells Fargo] and accepted by the [homeowner]." *Meyers*, NYLJ 1202475060382 at *4. A true and correct copy of the *Meyers* decision is attached.

A well-established legal theory satisfies a "logical precondition" for establishing a likelihood of success on the merits of the claim. *Doran v. Massachusetts Turnpike Authority*, 256 F.Supp.2d 48, 50-51 (D. Mass. 2003). Wells Fargo does not cite to a single case based on the TPP Agreements as evidence that there is no likelihood Plaintiffs will succeed on the merits of their claims. Plaintiffs have satisfied a major prerequisite to meeting their likelihood of success burden.

Plaintiffs easily bridge the gap between showing that they have a viable legal theory and showing that there is a likelihood that they will succeed on the merits with the substantial evidence they have presented that Wells Fargo does not honor TPP Agreements and wrongfully forecloses on borrowers' homes. The have submitted an expert report by the same individual who submitted an expert report in *Durmic*, which Judge Stearns refused to strike and deemed relevant to the case. Section, C, *infra*; Report of Christopher Wyatt, [Docket No. 35.1]. They have submitted numerous declarations and affidavits. Declaration of Jennifer Ryan Voltaire, [Docket No. 21]; Affidavit of Paul Montero, [Docket No. 33]; Declaration of Kevin Costello, [Docket No. 35]; Affidavit of Franco Zeppa, [Docket No. 35.2]; Affidavit of Mary Gracia and Bruce Gracia, [Docket No. 35.3]; Declaration of Gina Mestone, [Docket No. 35.4]; Expert Report of Christopher Wyatt, [Docket No. 35.1]. They have also cited news articles and reports discussing Wells Fargo's failures to honor agreements to provide permanent loan modifications. Section III(A) n6, *infra*. Wells Fargo even admits to "mistakes" in its Windust Declaration. Opposition, p. 19, *citing*, Windust Decl." ¶40.

This evidence, obtained at an early stage in the litigation, is sufficient to show that preliminary injunctive relief is necessary and warranted here.[8] *Commonwealth of Massachusetts v. Fremont Investment & Loan, et al.*, NO. 07-4373-BLS1, 2008 WL 517279, at *3 (Mass. Super. Feb. 26, 2008), *aff'd*, 897 N.E. 2d 548 (Mass. 2008) (considering evidence, as well as the reasonable inferences that could be made from the evidence, in granting injunctive relief requiring a mortgage lender to give the Attorney General notice before instituting foreclosure proceedings on borrowers' loans covered by the injunction). If the Court needs further evidence, it may order expedited discovery limited to Plaintiffs' preliminary injunction motion. Plaintiffs have requested this discovery. Notice Relief Motion, filed separately.

###### 2.    The Durmic Preliminary Injunction Order

Wells Fargo's sur-reply will most likely feature Judge Stearns' decision to deny Plaintiff's motion for preliminary injunction to stop foreclosures in *Durmic*. As discussed below, the facts influencing Judge Stearns' decision to deny injunctive relief in *Durmic* are not present here, and the legal issues of whether voluntary cessation deprives Plaintiffs and the putative class of standing and whether Plaintiffs have shown likelihood of success on the merits were not decided.

In *Durmic*, Judge Stearns concluded that the individual Plaintiff bringing the motion engaged in misconduct that disqualified her from seeking equitable relief. *Id*. He noted that she stopped making mortgage payments after the completion of her TPP Agreement, made a late payment during the TPP Agreement and that Chase paid property

---

[8] Wells Fargo's arguments on the merits of Plaintiffs' other legal claims, including promissory estoppel, breach of the covenant of good faith and fair dealing and violation of M.G.L. c 93A raise no new issues. Plaintiffs rely on their previous briefing and on the evidence in the record on these issues.

taxes on her behalf. *Id.* As a result, he concluded, Chase would be harmed if Plaintiff and others like her obtained injunctive relief. To the extent that the Court shares this concern, Mr. Montero continued to tender mortgage payments after the completion of his TPP Agreement. Montero Aff., ¶¶15, 24. Wells Fargo refused to accept payments, forcing Mr. Montero into default.[9] Montero Aff., ¶¶13-15, 18, 24. Mr. Montero is saving his monthly payment, ready to recommence making them. Montero Aff., ¶18. Wells Fargo has not offered evidence to show that Mr. Montero's TPP payments were late.

The other concern Judge Stearns expressed in *Durmic* was that the Plaintiff's request for injunctive relief was overbroad, because it includes borrowers who cannot afford to pay even modified mortgage loans, borrowers who are not eligible for the HAMP and borrowers who already obtained relief by accepting alternative non-HAMP loan modification offers. *Durmic*, at *7. These concerns are not present here. All of the homeowners who would get the benefit of the Preliminary Injunction received contractually invalid denials [Plaintiffs' Motion for Provisional Class Certification, [Docket No. 31]] or, in the alternative, like Mr. Montero were never denied at all, but nevertheless faced foreclosure. Finally, Borrowers who accepted alternative non-HAMP loan modification offers would not need the benefit of injunctive relief, because presumably their non-HAMP modifications prevent foreclosure.

In short, every homeowner with a TPP is contractually entitled to a proper evaluation of their right to a permanent modification no later than the close of their trial period. Any denial of permanent modification that takes place after that date is in breach

---

[9] Wells Fargo's refusal to accept his payments is further evidence of the harm borrowers suffer – further default – when Wells Fargo does not timely modify their loans.

of contract because "time is of the essence" is part of the explicit language of agreement.[10] Thus, homeowners who successfully completed their three-month trial periods, but who were subsequently issued denials after the trial period was over should have their foreclosures stayed while their rights are adjudicated.[11]

Finally, Judge Stearns did not decide the legal issue of whether Wells Fargo's voluntary cessation of Plaintiffs' foreclosures moots a case for injunctive relief for a similarly-situated group. Plaintiffs' voluntary cessation argument is sound. See, Section III(A), *supra*. In addition, Judge Stearns did not address the legal issue of whether the court can use its equitable powers to provide injunctive relief to a group of similarly situated borrowers without certifying a class under Fed. R. Civ. P. 23. As discussed in Section E, *infra*, the Court has this power and should exercise it.

Borrowers who have proven their ability and willingness to pay should not lose their homes because of Wells Fargo's misconduct. Commencing litigation was the only way Mr. Montero was able to ultimately secure a promise from Wells Fargo that will preserve his rights and prevent irreversible harm. Wells Fargo knows the identities of borrowers who are in Mr. Montero's situation and is not willing to make a promise that will protect them. Preliminary injunctive relief is therefore necessary to protect these borrowers.

---

[10] There may be other ways in which Wells Fargo breaches the contract as well – such as if Wells Fargo denies a permanent modification for failure timely to provide documents that were actually timely provided by homeowners to Wells Fargo. As reflected in the Complaint in this matter and in the declarations accompanying the Motion for Preliminary Injunction, this is a common occurrence.

[11] The court can easily condition injunctive relief on continued payment of TPP amounts in order to avoid providing the benefit of the injunctive to families who, for example, have left their homes.

### 3.      *Immediate Threat of Irreparable Harm*

As explained in Section, III(A), *supra*, Mr. Montero's standing was not altered by Wells Fargo's voluntary cessation of his foreclosure proceeding. Equally importantly, even though Wells Fargo has agreed not to pursue foreclosure proceedings against the named Plaintiffs and the "borrower declarants," it has made no promises and has not identified any policy that would protect borrowers who were improperly denied permanent HAMP modifications from foreclosure. Wells Fargo will therefore continue to foreclose on borrowers for whom it makes contractually invalid decisions to deny permanent HAMP modifications throughout the litigation. This means that each month that goes by during this litigation will inevitably result in class members who have complied with all the terms of their TPP Agreements improperly being found ineligible by Wells Fargo and referred for foreclosure. Under Wells Fargo's view, such homeowners should each be required individually to seek injunctive relief upon their being shifted into that category. Many of these individuals, at least until notice issues under Rule 23(c)(2), will not even know that an action is pending which seeks to protect their rights. *See Coleman v. Block,* 580 F. Supp. 194, 202-203 (D.C.N.D. 1984) (finding that class members were entitled to receive notice and a chance to be heard and to present evidence before the FmHA liquidated their mortgages).

Additionally, as detailed in Section II, *supra*, Wells Fargo's "policy" of not foreclosing on mortgages where a borrower has applied for a HAMP modification and Wells Fargo has not yet made an eligibility determination is clearly insufficient to protect borrowers from foreclosure, as was the case with the Voltaires who lost their home while their HAMP application was still under review.

### 4.   *Balance of Harms*

Wells Fargo's argument that the balance of harm favors it because the injunction Plaintiffs seek would incentivize homeowners to stop making mortgage payments completely ignores the relief Plaintiffs seek. Plaintiffs have not asked the Court to relieve those who gain the protection of the preliminary injunction from the obligation to make monthly payments as required by their TPP Agreements. The preliminary injunctive relief can be conditioned upon continued payments, thus maintaining the *status quo pendente lite*. The underlying purpose of the preliminary injunctive relief is to allow borrowers to stay on track with their monthly mortgage obligations as set forth in their TPP Agreements while avoiding foreclosure.

Wells Fargo has offered no proof that it will suffer harm should the Court grant the injunction. As Wells Fargo acknowledges, modifying loans, rather than foreclosing on mortgages, would allow Wells Fargo to mitigate its losses associated with the foreclosures Plaintiffs seek to enjoin. Wells Fargo & Co., Annual Report (Form 10-K), at 59 (2009)[12] (explaining to investors, in the context of discussing the HAMP, that "...a key factor to successful loss mitigation is tailoring the revised loan payment to the customer's sustainable income.").

### 5.   *Preliminary Injunctive Relief Will Serve the Public Interest*

The need for a preliminary injunction is further supported by recent foreclosure activity around the country and evidence of servicers' sloppiness and inattention to

---

[12] *Available at,* https://www.wellsfargo.com/invest_relations/annual (last viewed on December 3, 2010).

detail.[13]  Wells Fargo recently admitted flaws in its foreclosure activities, including

failure to check legal documents before initiating foreclosures, although it refused to

suspend any foreclosures while reviewing its procedures.[14]

A preliminary injunction would not, as Wells Fargo argues, impede an efficient

and stable real estate market.  (Opposition, p. 25).  Rather, it would ensure that

Massachusetts borrowers for whom Plaintiffs seek the injunction are given a fair

opportunity at keeping their homes, thereby preventing unnecessary foreclosures.  In

response to several banks' decisions in October 2010 to temporarily halt their

foreclosures while reviewing their foreclosure processes, Massachusetts Attorney

General Martha Coakley expressed that there is a strong public interest in temporarily

reviewing faulty foreclosure processes now to prevent any mistakes, rather than "to try to

undo the process several years from now."[15] In addition, the Congressional Oversight

---

[13] *See* David Streitfeld and Gretchen Morgenson, *Foreclosure Furor Rises; Many Call
for a Freeze*, N.Y. Times, October 5, 2010, *available at*
http://www.nytimes.com/2010/10/06/business/06mortgage.html?_r=1 (last visited
December 1, 2010); Michelle Singletary, *Foreclosure fiasco reveals basic problems with
mortgage industry*, The Boston Globe, October 17, 2010, *available at*
http://www.boston.com/business/personalfinance/articles/2010/10/17/foreclosure_fiasco_
reveals_basic_problems_with_mortgage_industry/ (last visited December 1, 2010)(Bank
of America, JP Morgan Chase, and GMAC Mortgage temporarily halted foreclosures
while reviewing its foreclosure procedures).
[14] Jia Lynn Yang, *Wells Fargo acknowledges problems in foreclosure paperwork,*
Washington Post, October 27, 2010, *available at* http://www.washingtonpost.com/wp-
dyn/content/article/2010/10/27/AR2010102707361.html (last visited December 1, 2010);
*November Oversight Report: Examining the Consequences of Mortgage Irregularities for
Financial Stability and Foreclosure Mitigation*, Congressional Oversight Panel at 62
(November 16, 2010), http://cop.senate.gov/documents/cop-111610-report.pdf.
[15] Todd Wallack, *No quick fix: Banks may need weeks to untangle foreclosure mess,* The
Boston Globe, October 15, 2010. Plaintiffs note that to the extent that state attorneys
general are working on an agreement with lenders over foreclosure practices that may
ultimately cover borrowers in the putative class here, preliminary injunctive relief is
necessary so that borrowers still have their homes if and when an agreement is reached.

Panel recently reported that a freeze on foreclosure proceedings could actually have the effect of causing home prices of unaffected homes to rise.[16] This is directly correlated to the strong public interest that exists in granting the preliminary injunction for Plaintiffs and the class in this case.

Wells Fargo also attempts to argue that the injunction would discourage lenders from participating in HAMP, thereby undermining the program.  Opposition, p. 26. However, Wells Fargo ignores that granting the injunctive relief will reinforce what has been explained as the key to the success of its sustainability- converting trial plans into permanent loan modifications. *See September Oversight Report: Assessing the TARP on the Eve of its Expiration*, Congressional Oversight Panel at 49 (September 16, 2010), http://cop.senate.gov/documents/cop-091610-report.pdf ("…the most important measure of HAMP's effectiveness is the number of sustainable permanent modifications…").

## C.     THE EXPERT REPORT OF CHRISTOPHER WYATT IS ADMISSIBLE AND PROBATIVE

Without filing a properly noticed motion to strike, Wells Fargo contests the admissibility of the Expert Report of Christopher Wyatt (Docket No. 35.1). Opposition, pp. 27-30. As an initial matter, the Court should not consider Wells Fargo's request because it is not properly before the Court. Even if it were, Judge Stearns' recent decision denying a motion to strike an expert report written by Mr. Wyatt about the HAMP implementation problems of a different servicer rejects the same arguments Wells Fargo

---

*See* David Streitfeld and Nelson D. Schwartz, *Foreclosure Fix Is Seen as Distant*, N.Y. Times, November 17, 2010, *available at* http://www.nytimes.com/2010/11/18/business/economy/18mortgage.html (last visited December 1, 2010).

[16] November Oversight Report at 73-74 ("Foreclosures have many well-documented negative financial and social consequences on families and neighborhoods that might be mitigated by a freeze.").

makes here and this Court should follow it.  *Durmic v. Chase*, No. 10-CV-10380 (D. Mass. Nov. 19, 2010).  After citing Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) as the "two gateposts" guiding a judge's discretionary decision to admit or exclude expert testimony, Judge Stearns held:

> Christopher Wyatt is sufficiently qualified through twenty years of experience with the mortgage lending industry to testify as to mortgage loan servicing operations, including the structuring of the federal Home Affordable Modification Program (HAMP) and its policies and procedures. More importantly, Wyatt's testimony is likely to be helpful to a jury in comprehending the complexities and operations of HAMP.

*Id.*

Judge Stearns explicitly held that the expert opinions and the summary of HAMP requirements offered by Mr. Wyatt are likely to be helpful in explaining "the complexities and operations of HAMP" and are therefore relevant.  *Durmic, supra.*

As to the report's reliability, Judge Stearns acknowledged Mr. Wyatt's extensive experience in finding that his report regarding another servicer was admissible.  *Durmic, supra*. Where an expert has extensive experience in a "highly specialized world," as Mr. Wyatt does, it is appropriate for the Court to give credence to his conclusions regarding the meaning of documents.  *Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 9 F.Supp.2d 49, 52 (D.Mass. 1998), *aff'd*, 217 F.3d 33 (1st Cir. 2000). There is probably no other person in the country with a background similar to Mr. Wyatt's who is willing to step forward to provide expert evidence for Plaintiffs in cases like the one before the Court.

Wells Fargo may disagree with Mr. Wyatt's interpretation of certain materials (*see* Windust Decl. ¶ 55), but the appropriate response is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not

exclusion of otherwise admissible evidence (*Durmic, supra*, quoting *Daubert*, 509 U.S. at

596).  Wells Fargo's request to strike Mr. Wyatt's report, to the extent the Court deems it

to be properly filed, should not be granted.

**D.**     **A BOND IS NOT NECESSARY BECAUSE WELLS FARGO IS ADEQUATELY PROTECTED**

Without specifying or quantifying any "potential losses" it would incur if the

Court entered an injunction, Wells Fargo makes an unfounded assertion that Plaintiffs

should post a bond because they are required to under Fed. R. Civ. P. 65(c). Opposition,

p. 30. Wells Fargo is wrong on the law. First Circuit case law makes clear that whether a

party seeking injunctive relief should be required to post a bond is within the discretion

of the court.  Among other things, the Court can consider the financial ability of Plaintiffs

to post a bond and the severity of the financial hardship that a bond might cause. *Crowley*

*v. Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers,*

*Warehousemen*, 679 F.2d 978, 1000 (1st Cir. 1982)("...at least in noncommercial cases,

the court should consider the possible loss to the enjoined party together with the

hardship that a bond requirement would impose on the applicant...[a] bond requirement

would have a greater adverse effect where the applicant is an individual and the enjoined

party an institution that otherwise has some control over the applicant than where both

parties are individuals or institutions."); *Coleman*, 562 F. Supp. at 1368 (waiving bond

requirement due to the plaintiffs' indigency); *see also*, *Herman v. Home Depot*, No. 1345,

2001 WL 705725, at *2 (Mass. App. Div. June 19, 2001) (a court need not require a party

obtaining a preliminary injunction to furnish a cost bond).

Moreover, Wells Fargo has not identified any losses it might suffer if the Court

granted the relief Plaintiffs seek. The Court may condition the preliminary injunctive

relief on Plaintiffs and class members making their TPP payments. Should the Court issue the injunction, the Court may require that notice be sent to those effected that advises them of the need to make payments consistent with their TPP payments as a condition of receiving injunctive relief.[17] Wells Fargo also has security in the underlying collateral for Plaintiffs' mortgages. Under these circumstances, Wells Fargo would be adequately protected should the Court issue the preliminary injunction.

Any bond requirement imposed on Plaintiffs struggling to save their homes from foreclosure would undermine the purpose of the preliminary injunctive relief that they seek. The Court should therefore exercise its discretion and waive any bond requirement in this case.

**E.      THIS COURT HAS EQUITY POWERS TO PROTECT PUTATIVE CLASS MEMBERS EVEN IF A CLASS IS NOT CERTIFIED**

"The court may... award a broad preliminary injunction, without a formal class ruling, under its general equity powers." Newberg On Class Actions § 9.45 at 413-14 (4th ed. 2002 and 2010 supp.) Thus in *Monavie, LLC v. Quixtar Inc*., 2009 WL 3584331(D.Utah October 26, 2009), for example, the court granted preliminary injunctive relief to an uncertified class, temporarily enjoining enforcement of defendant's arbitration agreement. "It is well-settled that a court may 'award appropriate class-wide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers.'" *Howe v. Varity Corp*., 1989 WL 95595, at *15 (S.D.Iowa, July 14, 1989) (citing *Thomas v. Johnston*, 557 F.Supp. 879, 916 n. 29 (W.D.Texas 1983); *Freeman v. Hayek*, 635 F.Supp. 178, 180

---

[17] The Court can require that notice be given to class members of the condition of ongoing TPP payments in the notice required under Rule 23(c)(2).

(D.Minn.1986) (preliminary injunction issued nine months prior to certification of class);

*Morrison v. Heckler*, 602 F.Supp. 1482, 1484 (D.Minn.1984), aff'd 787 F.2d 1285 (8th

Cir.1986) (court preliminarily certified class and issued preliminary injunction)).

Similarly, in *Giorgi v. Doody*, 537 F.Supp. 1251, 1254 (D.Mass.1982), this court granted

an injunction to prevent the destruction of the files of the purported class to prevent

irreparable injury. Surely it has the power to do likewise to prevent the loss of homes

*pendente lite* in this case.

In the alternative, the Court can grant precertification notice to affected class

members pursuant to Rule 23(d)(1)(B) even before a class is certified.  This option is

covered in more detail in the separately filed motion for notice relief and the

memorandum in support of that motion.

## IV.    CONCLUSION

For these reasons as well as those stated in other papers of record, the Court

should issue the preliminary injunction that Plaintiffs request. If the Court is not inclined

to grant the motion on the record before it, Plaintiffs ask for an opportunity to conduct

expedited discovery as requested by contemporaneous motion.

Dated: December 7, 2010

Respectfully Submitted,

Wilfredo and Odalid Bosque, Vera Vicente Meek, Jennifer Williams, Jennifer Ryan and Gary Voltaire, and Paul Montero, on behalf of themselves and all others similarly situated,

By their attorneys,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)

Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
Tel: (617) 542-8010
Fax: (617) 542-8028

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on December 7, 2010.

*/s/ Gary Klein*
Gary Klein