UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WILFREDO and ODALID BOSQUE, VERA VICENTE MEEK, JENNIFER WILLIAMS, JENNIFER RYAN and GARY VOLTAIRE, and PAUL MONTERO, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 10-10311-FDS |
| v. | ) ) ) | |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY, | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION,
PLAINTIFFS' MOTION CLASS CERTIFICATION,
PLAINTIFFS' MOTION FOR NOTICE RELIEF OR EXPEDITED DISCOVERY,
AND DEFENDANT'S MOTION TO DISMISS**

**SAYLOR, J.**

This contract dispute arises out of a government program to promote the modification of home mortgage loans to avoid foreclosure. After receiving billions of dollars from the United States government through the Troubled Asset Relief Program, defendant Wells Fargo Bank voluntarily agreed to participate in the Home Affordable Modification Program. Under that program, Wells Fargo receives incentive payments from the government in exchange for modifying terms of the mortgage loans for certain eligible borrowers. As part of the program, Wells Fargo signed Trial Period Plan agreements with various borrowers in Massachusetts.

Plaintiffs Wilfredo and Odalid Bosque, Vera Vincente Meek, Jennifer Williams, Jennifer Ryan and Gary Voltaire, and Paul Montero are homeowners who signed TPPs with Wells Fargo. They purport to represent a class of homeowner borrowers who likewise signed TPPs with Wells Fargo. They contend that the TPP was a binding contract between the parties, under which Wells Fargo was obligated to offer a permanent loan modifications if plaintiffs complied with the TPP's terms and conditions over a three-month trial period. Each plaintiff in the putative class allegedly complied with his or her obligations under the TPP; plaintiffs contend that Wells Fargo did not.

Invoking this Court's diversity jurisdiction, plaintiffs have brought four state-law claims: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) promissory estoppel, as an alternative theory of liability, and (4) violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A. Pending before the Court is defendant's motion to dismiss, plaintiffs' motion for a preliminary injunction, and plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2). Plaintiffs have also filed a motion under Fed. R. Civ. P. 23(d)(1) to serve notice of the pendency of this litigation on putative class members, or to expedite certain discovery under Fed. R. Civ. P. 26(b)(1). For the following reasons, defendant's motion to dismiss will be denied, plaintiffs' motions for a preliminary injunction and for class certification will be denied without prejudice to their renewal, and plaintiffs' motion for expedited discovery will be granted.

## I. Background

For the purposes of deciding the motion, the Court accepts as true all well-pleaded facts in plaintiffs' complaint.

### A. The Home Affordable Mortgage Program

Congress enacted the Emergency Economic Stabilization Act in the midst of the financial crisis of 2008. *See* Pub. L. No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201-5253). The centerpiece of the statute was the Trouble Asset Relief Program ("TARP"), through which the Secretary of the Department of Treasury was delegated broad powers to mitigate the financial impact of the foreclosure crisis and preserve homeownership. 12 U.S.C. §§ 5201, 5211-5241. One component of TARP requires the secretary to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . other available programs to minimize foreclosures." *Id.* § 5219(a).[1] Congress also granted the secretary authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.*[2]

Acting under this authority, the Secretary of the Treasury announced the "Making Home Affordable Program" in February 2009. (*See* Second Am. Class Action Compl. ("SAC") ¶ 30).[3] One sub-part of this program is the "Home Affordable Mortgage Program" ("HAMP"). The goal

---

[1] Section 110 of the statute contains an identical directive for any federal property managers who own or control mortgages and mortgage backed securities. *See* 12 U.S.C. § 5220(b)(1). It further defines "modifications" to include "reduction in interest rates; . . . reduction of loan principal; and . . . other similar modifications." *Id.* § 5220(b)(2).

[2] Section 109(c) of the statute, entitled "Consent to Reasonable Loan Modification Requests," provides:

> Upon any request arising under existing investment contracts, the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions, rate reductions, principal write downs, increases in the proportion of loans within a trust or other structure allowed to be modified, or removal of other limitation on modification.

12 U.S.C. § 5219(c).

[3] The Department of the Treasury created the Making Home Affordable Program jointly with the Federal Housing Finance Agency, the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). *See Williams v. Geithner*, 2009 WL 3757380, at *2 (D. Minn. Nov. 9, 2009).

of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt. (*See* SAC, Ex. 2, Supplemental Directive 09-01 ("SD 09-01")). Under HAMP, loan servicers are provided with $1,000 incentive payments for each permanent mortgage loan modification completed.[4] These modifications proceed under a uniform process designed to identify eligible borrowers and render their debt obligations more affordable and sustainable.

The Department of the Treasury has issued a series of directives that provide guidance to servicers implementing HAMP.[5] Under these guidelines, mortgage servicers are directed to identify and solicit borrowers who are in default on their mortgage payments, or soon will be. (*See* SD 09-01, at 2). Within this group, borrowers may be eligible for a loan modification under HAMP if the mortgage loan originated before January 1, 2009; if the mortgage is secured by the borrower's primary residence; and if the mortgage payments amount to more than 31% of the borrower's monthly income. (*Id.*).[6] To participate in HAMP, borrowers must submit an affidavit documenting financial hardship. (*Id.* at 3). In addition, the servicer must conduct a Net Present Value ("NPV") test, which assesses whether it would be more advantageous to foreclose or to modify the terms of the first-lien loan. (*Id.* at 3-5).

---

[4] Wells Fargo receives additional incentive payments under HAMP if the borrower stays less than 90 days delinquent on the modified loan. (*See* Windust Decl. ¶ 8).

[5] The contract that Wells Fargo signed incorporates all guidelines, procedures, and "supplemental documentation, instructions, bulletins, frequently asked questions, letter, directive, or other communications" issued by Treasury, Fannie Mae, or Freddie Mac regarding servicers' duties under HAMP. (SAC ¶ 38; Ex. 1).

[6] There are several other eligibility requirements. Among other things, the mortgage loan must be secured by property containing no more than four units, and, depending on the number of units, the guidelines set ceilings on the unpaid principal balance. (*See* SD 09-01, at 2-3).

4

If the homeowner qualifies under these eligibility criteria, the servicer should offer the homeowner a Trial Period Plan ("TPP") agreement. (SAC ¶ 41). Under the TPP, the borrower pays modified mortgage payments calculated based on the financial documentation submitted during the eligibility phase. The homeowner is also required to open an escrow account and submit additional financial documents, and may be required to undergo credit counseling. The trial period lasts for three months. (*See* SD 09-01, at 17). As long as the borrower has complied with the terms of the TPP and the income representations have been verified, the servicer is directed to offer the borrower a permanent modification at the end of the three-month period. (*See id.* at 17-18).[7] The controlling supplemental directive anticipates that the servicer will verify the borrower's representations regarding their income during the trial period. (*See id.*).

B. **Contractual Language in the Trial Period Plan Agreements**

The government created one uniform agreement to be executed by servicers and eligible borrowers. The TPP is a four-page document and "has the appearances of a contract." *Durmic v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 4825632, at *1 (D. Mass. Nov. 24, 2010).[8] The first sentence of the TPP provides:

> If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

(SAC, Ex. 7, Bosque TPP). Four sentences later, the TPP states, "I understand that after I sign

---

[7] SD 09-01 provides, "If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan." (SD 09-01, at 18).

[8] As Judge Stearns noted in *Durmic*, the TPP "characterizes itself as an agreement, contains signature lines for the Lender and the Borrower and includes distinctly contractual phrases such as 'under seal' and 'time is of the essence.'" 2010 WL 4825632, at *1 n. 4.

5

and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer." (*Id.*).

Section 2 of the TPP sets forth the amount and date of each monthly payment, and states that "TIME IS OF THE ESSENCE under this Plan." (*Id.* ¶ 2). It next details three conditions under which the TPP would not result in a permanent modification: if, prior to the Modification Effective Date, (1) if the Lender does not provide the borrower with a fully executed copy of the plan and permanent modification agreement, (2) if the borrower does not make all payments provided under the plan, or (3) if the financial representations made in the eligibility assessment stage are no longer correct. (*See id.* ¶ 2(F)).

Section 3 explains how the permanent loan modification will be calculated. It then provides:

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount . . . .

(*Id.* ¶ 3).

### C. The Circumstances of the Named Plaintiffs

In April 2009, Wells Fargo voluntarily entered into a contract with the Department of the Treasury to participate in HAMP. (*See* SAC, Ex. 1, Servicer Participation Agreement). The named plaintiffs then sought to participate in the HAMP program.

After conducting an NPV analysis and examining plaintiffs' financial documents, Wells Fargo determined that each of the seven named plaintiffs was eligible to participate in the HAMP

6

program. Each plaintiff signed and returned a TPP to Wells Fargo, and then timely made all three required monthly payments under the terms of their individual TPP. (SAC ¶¶ 54-55 (Bosques); ¶¶ 70-72 (Meek); ¶¶ 86, 89-90 (Williams); ¶¶ 102, 106-08 (Ryan and Voltaire); ¶¶ 123, 128 (Montero)). Each plaintiff also submitted all additional financial documents requested by Wells Fargo and otherwise complied with their obligations under the TPP. (SAC ¶¶ 55-56 (Bosques); ¶¶ 72-73, 77 (Meek); ¶¶ 89-91 (Williams); ¶¶ 102, 106-08 (Ryan and Voltaire); ¶¶ 123, 128 (Montero)).

Plaintiffs allege that Wells Fargo failed to provide them with a permanent modification agreement on the modification effective date specified in their TPPs. (SAC ¶ 56 (Bosques); ¶ 73 (Meek); ¶ 95 (Williams); ¶ 115 (Ryan and Voltaire); ¶ 132 (Montero)). The complaint further asserts that Wells Fargo failed to notify plaintiffs of *any* decision with regard to their loan modification status. (SAC ¶¶ 55-56 (Bosques); ¶¶ 73-74 (Meek); ¶¶ 91-95 (Williams); ¶ 107 (Ryan and Voltaire); ¶ 132 (Montero)). In the case of the Bosques, Williams, and Ryan and Voltaire agreements, Wells Fargo has continued accepting monthly payments prescribed in the TPP beyond the date by which a permanent loan modification decision should have been tendered. (SAC ¶ 55 (Bosque); ¶ 95 (Williams); ¶ 107 (Ryan and Voltaire)).[9] Despite plaintiffs' alleged compliance with the terms of their TPPs, Wells Fargo has sent letters to plaintiffs indicating that the paperwork submitted was not compliant or that plaintiffs were delinquent in their underlying mortgage payments. (SAC ¶ 57 (Bosques); ¶ 75 (Meek); ¶ 95 (Williams); ¶ 110-11, 113 (Ryan and Voltaire); ¶ 135 (Montero)). Wells Fargo has initiated foreclosure proceedings on the Ryan

---

[9] Montero did not continue making payments beyond the modification effective date in his TPP because a Wells Fargo employee told him that he should not send any additional payments, but instead to wait for his permanent modification agreement to arrive in the mail. (SAC ¶¶ 129-30, 133).

7

and Voltaire property, and has threatened foreclosure on Montero's property.  (SAC ¶¶ 115-16 (Ryan and Voltaire); ¶¶ 133-34 (Montero)).[10]

The complaint alleges that the TPP is a binding contract, and that Wells Fargo has breached that contract.  Their filings present different theories as to defendant's obligations under the TPP.  At times, plaintiffs have argued that they are entitled to a permanent modification as long as they complied with their obligations under the TPP.  More recently, plaintiffs contend that they are merely entitled to a decision by Wells Fargo as to whether they will receive a permanent modification by the modification effective date specified in section 2 of the TPP.

Plaintiffs have brought four claims:  (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) promissory estoppel, as an alternative theory of liability, and (4) violation of Mass. Gen. Laws ch. 93A.  They seek injunctive and declaratory relief, specific performance, damages, and attorney's fees.  Plaintiffs have also filed motions seeking provisional class certification and a class-wide preliminary injunction that would bar Wells Fargo from foreclosing on any class member during the pendency of the lawsuit.  As an alternative to class certification, plaintiffs have filed a motion requesting notice relief or narrowly-tailored expedited discovery.

## II. Defendant's Motion to Dismiss

### A. Standard of Review

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom."

---

[10] The parties have stipulated that Wells Fargo would not initiate a foreclosure sale on the Ryan and Voltaire and property until after entry of judgment in this action.  (SAC ¶ 117).

8

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

### B. <u>Analysis</u>

#### 1. <u>Standing</u>

Defendant first contends that plaintiffs have no standing to bring this suit because neither the EESA nor the HAMP guidelines extend to borrowers a private right of action. Defendant acknowledges that plaintiffs have brought four state-law claims, not claims under HAMP or the EESA, but contends that plaintiffs are attempting to "use state law as an indirect means to enforce HAMP." (Def.'s Mot. at 12). In support of this argument, defendant cites various cases holding that HAMP provides no private right of action. *See, e.g.*, *Hoffman v. Bank of Am., N.A.*, 2010 WL 2635773, at *5 (N.D. Cal. June 20, 2010); *Gonzalez v. First Franklin Loan Servs.*, 2010 WL 144862, at *18 (E.D. Cal. Jan. 11, 2010). Defendant also cites cases concluding that neither the EESA nor HAMP creates a property interest in permanent modification for borrowers. *See, e.g.*,

*Williams v. Geithner*, 2009 WL 3757380, at *6 (D. Minn. Nov. 9, 2009) (determining that the HAMP regulations "did not intend to create a property interest in loan modifications for mortgages in default," and thus finding no likelihood of success on the merits of plaintiffs' due process claim).[11]

Whether HAMP creates a private right of action or a cognizable property interest is not the issue in this case. Plaintiffs have brought suit on the theory that the TPP constituted a contract between defendant and plaintiffs, and that defendant breached that contract. Their claims arise under defendant's alleged failure to comply with its contractual obligations in the TPPs.

Nevertheless, defendant contends that because the TPPs originated out of the HAMP program, plaintiffs cannot vindicate any rights that relate to HAMP. That argument is plainly without merit. Defendants do not contend that the EESA, HAMP, or the HAMP guidelines preempt state-law contract actions. The fact that a TPP has a relationship to a federal statute and regulations does not require the dismissal of any state-law claims that arise under a TPP. Nor does the fact that the TPP is a form contract created by the government change that analysis. If the TPP is properly construed as a contract between the parties in this case, then plaintiffs have standing to bring suit in order to recover for any breach of that contract.

   2.   **Breach of Contract**

In order to assert a claim for breach of contract in Massachusetts, plaintiffs must allege "that there was a valid contract, that the defendant breached its duties under its contractual

---

[11] Defendants also cite cases holding that borrowers may not sue as third-party beneficiaries to a Servicer Participation Agreement contract between Treasury and a mortgage servicer. *See, e.g.*, *Hoffman*, 2010 WL 2635773, at *3; *Escobedo v. Countrywide Home Loans, Inc.*, 2009 WL 4981618, at *2-3 (S.D. Cal. Dec. 15, 2009). Plaintiffs in this case have not, however, asserted breach of contract claims as third-party beneficiaries.

agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted). The elements of a valid contract are an offer, acceptance, and an exchange of consideration or a meeting of the minds. *See Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009). Defendant contends that these elements of a contract cannot be established as a matter of law.

Defendant first asserts that the TPP should not be construed as an enforceable offer. A party makes an offer when it manifests "a willingness to enter into a bargain, so made as to justify another person in understanding that his asset to that bargain is invited and will conclude it." *Bourque v. FDIC*, 42 F.3d 704, 709 (1st Cir. 1994) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24, at 71 (1981)). Here, it is plain that the TPPs were offers, and that plaintiffs' signatures and subsequent monthly payments under the terms of the TPP constituted acceptance of those offers. The TPP denotes the terms and duties that each party must perform under the bargain. In capital letters, it alerts the parties that "time is of the essence" for performance under the terms of the offer. Through its signature line and detailed description of the dates and manner by which the borrower submits monthly payments, the TPP indicates a straightforward method of acceptance. Indeed, the HAMP guidelines refer to the TPP as an "offer" and the monthly payments under it as "contractual payment[s]." (SD 09-01, at 15 ("The servicer may, in its discretion, consider the offer of a Trial Period Plan to have expired at the end of 60 days if the borrower has not submitted both an executed Trial Period Plan and complete documentation as require under the Trial Period Plan."); *id.* at 18 ("Note that under the terms of the Agreement, trial payments should be applied when they equal a full contractual payment (determined as of the time the HAMP is offered).").

Defendant next contends that even if the TPP can be construed as an offer, it is not a contract because it lacks consideration. A contract supported by consideration contains a "bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." *Durmic*, 2010 WL 4825632, at *3 (quoting *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) (internal citation and quotation marks omitted)). Invoking the pre-existing duty rule, defendant contends that because plaintiffs' partial monthly mortgage payments under the TPP went towards satisfying their undisputed pre-existing mortgage loan obligations, the TPP payments cannot constitute new bargained-for consideration. *See In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980).

Defendants are correct that modified mortgage payments standing alone would likely not constitute cognizable consideration under the TPP. Plaintiffs' legal detriment, however, consisted of more than the modified monthly payments. As Judge Stearns noted in *Durmic*, "[u]nder the TPP, [plaintiffs] were required to provide documentation of their current income, make legal representations about their personal circumstances, and agree to undergo credit counseling if requested to do so. . . . Plaintiffs could also be required to make payments into a newly established escrow account." 2010 WL 4825632, at *3. These conditions of the TPP all constitute new legal detriments to plaintiffs that flowed from their acceptance of the TPP. *See Wit v. Commercial Hotel Co.*, 253 Mass. 564, 572 (1925). Accordingly, plaintiffs have sufficiently alleged that the TPP was supported by consideration.

Next, defendant contends that the TPP lacks definite and essential terms because it does not specify the terms—such as repayment dates, the amount to be repaid, and the interest rate—for a permanent loan modification. Plaintiffs do not argue, however, that the TPP is a

contract for a permanent loan modification. Instead, plaintiffs' theory is that the TPP is a contract governing the three-month trial period, and that compliance with its obligations entitles plaintiffs to either (1) a new contract with a permanent loan modification or (2) a decision on whether plaintiffs are entitled to the permanent modification by the modification effective date stated in the TPP. Although the TPP is neither internally consistent nor clear with respect to defendant's ultimate obligation to borrowers who comply with its terms, it does establish clear terms with respect to the modified payments during the three-month trial period.[12] At a minimum, then, the TPP contains all essential and material terms necessary to govern the trial period repayments and the parties' related obligations.

Defendant's final argument is that plaintiffs have not alleged a valid measure of any damages to which they are entitled. Plaintiffs disagree, noting that, at a minimum, they have alleged damages in the form of accrual of fees and charges in the period during which defendant should have tendered a permanent loan modification or at least a decision. Plaintiffs Ryan and Voltaire have also alleged that defendant foreclosed on their home, leading to various damages should foreclosure have been improper. In any event, the Court need not determine at this stage in the litigation the measure or scope of plaintiffs' alleged damages, because plaintiffs need not plead specific damages flowing from a breach of contract in their complaint. *See Sherlag v. Kelley*, 200 Mass. 232, 236 (1908).

---

[12] At times, the TPP speaks in definite language, stating that the servicer "will" provide borrowers who comply with permanent loan modifications. (SAC, Ex. 7, Bosque TPP). Elsewhere, the TPP seems to anticipate that servicers retain discretion to deny borrowers who comply with their duties a permanent modification. (*See id.*). Whether, however, the TPP obligates servicers to provide borrowers who are in compliance with a permanent loan modification or merely a decision on a permanent loan modification is an issue better resolved at a later stage of the proceedings.

In sum, plaintiffs have sufficiently alleged all the elements of a claim for breach of contract. Defendant's motion to dismiss the contract claim will therefore be denied.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing

"Every contract implies good faith and fair dealing between the parties to it. The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to its fruits of the contract." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 569-70 (2010) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)). In order to prevail on this claim, plaintiffs must show that defendant "acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing." *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996). Courts must consider whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligation, as reflected in the overall spirit of the bargain," when analyzing these claims. *Speakman v. Allmerica Financial Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Although the complaint does not allege that defendant acted with a dishonest purpose or deliberate wrongdoing, it does detail a series of defendant's actions and omissions that undermined its ability to perform under the TPP and meet plaintiffs' performance expectations. (SAC ¶¶ 164, 166). This is sufficient to state a claim under the breach of the implied covenant of good faith and fair dealing. Resolution of the contours of the breach, if any, is best left to a later stage of the proceeding. *Accord Durmic*, 2010 WL 4825632, at *5. Defendant's motion to dismiss the claim of breach of the implied covenant will therefore be denied.

### 4. Promissory Estoppel

As it is in this case, promissory estoppel is usually asserted as an alternative theory of recovery for a contract that is not supported by consideration. Because plaintiffs have stated a plausible claim for breach of a contract supported by consideration, the Court need not consider the alternative estoppel theory at this juncture. *See Durmic*, 2010 WL 4825632, at *5. Defendant's motion to dismiss the promissory estoppel claim will therefore be denied.

### 5. **Massachusetts Consumer Protection Act**

Plaintiffs' final claim is that defendant engaged in unfair and deceptive actions in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9. The Supreme Judicial Court has observed that ch. 93A "is a 'statute of broad impact' that forms a 'comprehensive substantive and procedural business and consumer protection package.'" *Leardi v. Brown*, 394 Mass. 151, 159 (1985) (quoting *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975)). Defendants contend that the plaintiffs have failed to allege unfair or deceptive practices, injury, and causation to support their ch. 93A claim. They further argue that the demand letter sent by the Bosques on behalf of themselves and the putative class was insufficient to constitute a demand letter sent on behalf of the five other named plaintiffs.

The complaint alleges that defendant violated several regulations promulgated pursuant to Mass. Gen. Laws ch. 93A. (*See* SAC ¶ 177). In particular, it alleges that defendant made deceptive, false or misleading representations to plaintiffs regarding their eligibility for a permanent loan modification and their rights under HAMP. (*See id.*). Plaintiffs allege that they were led to believe that they would be entitled to a permanent loan modification or a denial of eligibility if they complied with their obligations under the TPP. These allegations are plainly sufficient to state a claim under ch. 93A for unfair or deceptive practices. The complaint also

15

details several injuries resulting from defendant's allegedly deceptive representations about HAMP, including wrongful foreclosures, increased fees, costs incurred to avoid foreclosure, loss of opportunities to pursue refinancing or loss mitigation strategies, and emotional distress. (*See* SAC ¶ 178). Plaintiffs' allegations of injury and causation are sufficient to state a claim under ch. 93A. *See Leardi*, 394 Mass. at 160-61 (describing the broad contours of the injury requirement in ch. 93A claims).

On February 24, 2010, Wilfredo and Odalid Bosque, along with another plaintiff no longer a party to this suit, sent a ch. 93A demand letter to defendant on behalf of themselves and "a class of similarly situated individuals." (*See* SAC, Ex. 13). The other five named plaintiffs were not parties to this action at the time the letter was sent. When they were joined, however, they did not send defendant additional ch. 93A demand letters. Defendant contends that because the original demand letter did not adequately describe the particularized injuries of the remaining five plaintiffs, the claims brought by those plaintiffs under ch. 93A should be dismissed.

Massachusetts courts, however, have determined that in a putative class action, the demand letter need only be sent by a class representative on behalf of herself and the entire class, as long as the letter sufficiently describes the claimant's injuries. *See Baldassari v. Public Fin. Trust*, 369 Mass. 33, 42 (1975) ("[i]f a proper demand is made by one plaintiff, . . . we think he and others similarly situated may join in a class action to redress that injury and similar injuries caused by the same act or practice."); *Richards v. Arteva Specialties S.A.R.L.*, 66 Mass. App. Ct. 726, 733 (2006) ("in judging the sufficiency of . . . a precertification demand letter, we look solely to the description of the individual claimant's own injury, and the central issue in this case

becomes whether the demand letter sufficiently described the injury suffered by the plaintiff herself").

Defendant contends that even though one demand letter satisfies the statute's requirement as to other class members, it cannot as to other named plaintiffs. It appears, however, that under Massachusetts law a demand letter that identifies the particularized injuries of one class representative claimant and gives notice to defendant of the pendency of the class action is sufficient. The claims of the remaining five named plaintiffs in this case share the same features and grievances as other members of the putative class, and it is difficult to see how the notice function of the demand letter would be better served by requiring those plaintiffs to send individualized demand letters, but not other members of the putative class. Defendant's motion to dismiss plaintiffs' claims under ch. 93A will therefore be denied. *Accord Durmic*, 2010 WL 4825632, at *6.

### III. Plaintiffs' Motion for Class Action Certification or, in the Alternative, Motion for Notice Relief under Rule 23(d)(1) or Limited Discovery under Rule 26(b)(1)

On September 15, 2010, plaintiffs filed a motion under Fed. R. Civ. P. 23 seeking to certify a "provisional" class of Massachusetts homeowners. The class definition includes borrowers who entered into TPP agreements with Wells Fargo, and fulfilled their obligations under the TPP, but did not receive a modification agreement or a written denial of eligibility by the modification effective date identified in section 2 of the TPP.

On December 6, plaintiffs filed a motion for notice relief under Rule 23(d)(1) or, in the alternative, a motion for expedited discovery under Rule 26(b)(1). These motions were styled as motions that could be granted in the alternative to the motion for provisional class certification.

17

The motion for notice relief requests this Court to order defendant to provide notice of the pendency of this action to all borrowers who signed TPPs with Wells Fargo but did not receive a permanent loan modification or a denial of eligibility for a permanent modification by the date specified in the TPP. The request for limited expedited discovery includes a request to take deposition of a Wells Fargo senior vice president with knowledge of the company's policies for determining permanent modification eligibility under HAMP, and to request the production of certain related documents.

A party seeking class certification must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) and at least one of the sub-elements of Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). While the complaint asserts that the class could consist of "many hundreds of individuals" (SAC ¶ 141), Wells Fargo contends that there are fewer than twenty borrowers in Massachusetts that have signed TPPs but have not received a permanent modification or a denial. (*See* Def.'s Opp. Mot. Class Certification, at 17).[13] Under Fed. R. Civ. P. 26(b)(1), this Court has discretion to order discovery of any relevant matter when good cause has been shown. Plaintiffs have proposed that the deposition of a Wells Fargo executive and the document requests would be limited to the following three topics: (1) Wells Fargo's policies regarding foreclosure proceedings on borrowers participating in HAMP, as well as the number of HAMP participants in Massachusetts in danger of or currently being foreclosed upon, (2) the manner in which Wells Fargo determines

---

[13] The declaration of Ben Windust submitted by Wells Fargo suggests a class of between 18 and 2,600 members. Windust testifies that there are approximately 18 borrowers in Massachusetts who received TPPs but have not received a permanent modification or a denial of eligibility. (Windust Decl. ¶ 35). However, there are 2,600 borrowers who were on TPPs but already received a denial of eligibility by Wells Fargo. (*Id.* ¶ 38). It is unclear whether the borrowers in this latter group received their denials of eligibility before the modification effective date stated in their TPPs, and whether they complied with all the terms of their TPPs.

18

whether a borrower is eligible for a HAMP modification, and (3) the number and identities of borrowers who received TPP agreements and who are awaiting HAMP eligibility determinations, as well as those borrowers who received written denials of eligibility after the modification effective dates specified in their TPPs. (*See* Pls.' Mot. Expedited Disc. at 11). The Court concludes that good cause has been shown to order this discovery, which is relatively narrow and particularized and addresses issues related to possible class certification.

Accordingly, plaintiffs' motion for class certification will be denied without prejudice to its renewal, and plaintiffs' motion for limited expedited discovery will be granted.

### IV. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs have also filed a motion seeking a preliminary injunction that would bar defendant from foreclosing on any member of the putative class until a determination on the merits in this case. Because the Court is ordering limited expedited discovery on the size of the putative class and defendant's HAMP eligibility determination and foreclosure procedures, issuing a preliminary injunction that would apply to the entire putative class would be premature. Plaintiffs' motion for a preliminary injunction will therefore be denied without prejudice to its future renewal. Should the limited discovery indicate that HAMP borrowers in Massachusetts still face an unwarranted risk of foreclosure by defendant, plaintiffs may re-file their motion for preliminary injunctive relief.

### V. Conclusion

For the foregoing reasons, defendant's motion to dismiss is DENIED. Plaintiffs' motion for provisional class certification and preliminary injunction are DENIED without prejudice to their future renewal. Plaintiffs' motion for expedited discovery is GRANTED, and the Court

19

hereby orders defendant, within 30 days, to produce documents and make available Ben Windust for a deposition involving the following three topics: (1) Wells Fargo's policies regarding foreclosure proceedings on borrowers participating in HAMP, as well as the number of HAMP participants in Massachusetts in danger of or currently being foreclosed upon, (2) the manner in which Wells Fargo determines whether a borrower is eligible for a HAMP modification, and (3) the number and identities of borrowers who received TPP agreements and who are awaiting HAMP eligibility determinations, as well as those borrowers who received written denials of eligibility after the modification effective dates specified in their TPPs.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: January 26, 2011    United States District Judge